**MFS MUNICIPAL INCOME TRUST, MFS Managed High Yield Municipal Bond Trust, and Lifetime Managed Municipal Bond Trust, Plaintiffs,**

v.

**AMERICAN MEDICAL INTERNATIONAL, INC.; Forum Health Investors of Georgia, Inc.; Brookwood Health Services, Inc.; Southwest Medical Center, Inc.; Stephens Inc.; and J. Dennis Meaders, Defendants.**

Civ. A. No. 89–0185–S.

United States District Court, D. Massachusetts.

Nov. 15, 1990.

Gerald F. Roth, Bingham, Dana & Gould, Boston, Mass., for plaintiffs.

T. Christopher Donnelly, Nutter, McClennen & Fish, Boston, Mass., for defendants.

## ORDER AND MEMORANDUM ON DEFENDANT STEPHENS' MOTION FOR APPROVAL OF SETTLEMENT

SKINNER, District Judge.

This action arises from an alleged fraudulent inducement to purchase $8.5 million in Louisiana Public Facilities Authority 1987 Revenue Refunding Bonds. The case is brought under federal law (§ 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated by the Securities and Exchange Commission) and under Massachusetts law (common law tort and contract, and the Massachusetts Uniform Securities Act).

The bonds financed the sale of and were payable by Southwest Medical Center, Inc., ("Southwest") doing business as the Riverside Community Hospital in Bossier City, Louisiana. American Medical International ("AMI") and Brookwood Health Services ("Brookwood") were the original owners of Southwest. They sold Southwest to Forum Health Investors ("AMI") through an affiliate. Mr. Meaders is the principal of FHI. Stephens was the underwriter in this financing transaction.

The purchasers of the bonds ("MFS") allege that the defendants knowingly led them to believe that Dr. Roberson, a substantial revenue generator for Southwest, would continue to work at the Hospital at a time when the defendants knew that Dr. Roberson had decided to resign.

The plaintiffs and defendant Stephens have negotiated a settlement and seek approval of the settlement and an order barring any claims for contribution by the nonsettling defendants.

Although I previously applied the *pro tanto* or "settlement bar" rule to partial settlements of § 10(b) and Rule 10b–5 claims in *In re Atlantic Financial Management, Inc. Secur. Litigation,* 718 F.Supp. 1012 (D.Mass.1988), the non-settling defendants have raised serious objections to the continued vitality of that rule. Consequently, this motion raises the issues of whether a uniform federal common law standard or the forum state law should determine the availability of contribution bars and the amount of set-off due non-settling defendants; and if federal common law is applicable, which of the three currently used rules should be applied.

As to those claims which are based on state law, M.G.L. ch. 231B, § 4 generally governs the parties' contribution rights. However, if a uniform federal law applies to the Rule 10b–5 claim, then an issue of preemption arises.

I.  Contribution Bar for Federal Securities Action

Background

It is well settled that parties jointly liable for violating § 10(b) and Rule 10b–5 have a right to contribution. The primary policy underlying contribution rights is the promotion of fairness to defendants and the deterrence of wrongdoing by spreading liability among violators. However, the right of contribution creates difficulties in multi-defendant actions by removing the incentive to settle. Non-settling defendants may still file claims for contribution against a joint tortfeasor who has been discharged of direct liability through settlement. This application of the contribution law prevents partial settlements, allowing only complete settlements in complex litigation. *See In re Nucorp Energy Secur. Litigation,* 661 F.Supp. 1403, 1408 (S.D. Cal.1987).

Given the strong federal policy favoring settlements, federal courts have explored a

middle ground that would spread liability among violators but not deter partial settlement. The solution has been to discharge the settling defendant from liability for contribution, but also to provide non-settlors with a set-off against any ultimate judgment. The method for calculating the set-off has been the major point of difference among the courts.

At the same time, states have enacted statutory schemes adopting contribution bars and various set-off calculations.[1] The amount of the set-off is either the settlement figure, *e.g.,* Massachusetts G.L., ch. 231B, California Civ.Pro.Code § 877, the portion of the judgment representing the settling defendant's relative fault, or the greater of the two amounts, *e.g.* New York G.O.L., § 15–108.

*Uniform Federal Law or State Forum Law?*

The contribution bar rules for § 10(b) and Rule 10b–5 are federal law. *See Franklin v. Kaypro Corp.,* 884 F.2d 1222, 1228 (9th Cir.1989), *cert. denied Franklin v. Peat Marwick Main,* — U.S. —, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990); *Singer v. Olympia Brewing Co.,* 878 F.2d 596, 599 (2nd Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). In the absence of direction from Congress, the courts must still decide whether to borrow the substance of the rule from the laws of the forum states, or to fashion a uniform federal law. In *Atlantic Financial,* I did not address this issue since the *pro tanto* rule, which I viewed at the time as being the most preferable federal law, is also Massachusetts law. The continued instability in the federal law of contribution, however, calls for further reflection at this point.

One of the leading cases in the Second Circuit established a federal right of set off based on the forum law of New York. *First Federal Sav. & Loan Assoc. v. Oppenheim, Appel, Dixon & Co.,* 631 F.Supp.

---

1. In *Franklin v. Kaypro Corp.,* 884 F.2d 1222, 1228 (9th Cir.1989), cert. denied *Franklin v. Peat Marwick Main,* — U.S. —, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990), the court of appeals reported that 39 states and the District of Columbia

allow contribution. In *Nelson v. Bennett,* 662 F.Supp. 1324, 1329 n. 7 (E.D.Cal.1987), the district court reported that 21 states allowed a contribution bar to settling defendants.

1029 (S.D.N.Y.1986). Judge Lasker found no compelling reason to apply a uniform federal rule. The application of the forum state's law would ease the complexity created in calculating the set-off in cases involving both federal and state claims. Shortly thereafter *Nelson v. Bennett*, 662 F.Supp. 1324 (E.D.Cal.1987), postulated three interdependent reasons for creating a uniform federal rule. The Second and Ninth Circuits have since embraced that reasoning. *Singer*, 878 F.2d at 599–600; *Kaypro*, 884 F.2d at 1228. First, a settlement bar rule affects key substantive rights under the federal securities law. It is incumbent on the federal courts "to fill the interstices of federal legislation according to their own standards." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979). The goal of promoting settlement, like many other issues in securities law, is a federal concern. Second, adopting the forum state law would lead to disparate results among the different districts, particularly when some states lack any right to a contribution bar and set-off. Some federal actions would be amenable to settlement, while others would be virtually barred from partial settlement, depending on the forum. Third, the discrepancy in this major element of litigation would encourage forum shopping.

*Uniform Federal Set-off Rule*

Federal courts agree that a contribution bar should be given a settling defendant to promote settlement of federal securities claims. The remaining question is, if the set-off rule is to be uniform, what should it be? Since I addressed this issue in *Atlantic Financial*, the topography of the discussion has changed. Adding to the confusion is the emergence of a third set-off calculation and the introduction of new terminology.

*The Set-off Rules*

■ The *pro tanto* rule [2], applied in *Atlantic Financial*, provides for a fairness hearing as a prerequisite to settlement. Provided that the settlement is deemed fair, the non-settling defendant is given a set-off in the amount of the settlement. The comparative fault of the defendants is given attention in the fairness hearing, but is not considered in the set-off once the court has found the settlement to be fair. The result of this rule is that the plaintiff always receives the full amount of the awarded damages and the non-settling defendants may pay something other than a calculated percentage of their share.

The "capped comparative fault" rule [3], applied in *First Federal*, provides a set-off to the non-settling defendants in the amount of the settlement or the settlor's share of the final judgment, based on its culpability, whichever is greater. The court must merely find good faith in approving the settlement. The shares of culpability are determined at trial. The result of the rule is that if the settlor underpaid its share, then the non-settling defendants need only pay their share and the plaintiff is not made whole. If the settlor overpaid, then the non-settling defendants may deduct the amount of the overpayment from their share. The non-settling defendants get a windfall, but the plaintiff is made whole.

The "pure comparative fault" rule applied in *Kaypro* provides a set-off in the amount of the settlor's share of fault, regardless of the settlement amount. As in the capped comparative fault rule, the court merely finds good faith in approving the settlement and the settlor's share is determined at trial. The result of this rule is that the plaintiff reaps the benefit or the loss of its bargain. The non-settling defendant must pay its share regardless of whether the settlor overpaid or underpaid. Consequently, if the settlor overpays, the plaintiff may collect more than the total judgment at trial.

---

**2.** The *pro tanto* rule is also known as the settlement bar rule.

**3.** The capped comparative fault rule was previously known as the comparative fault or proportionate or proportional rule. However, the introduction of a third rule by the Ninth Circuit makes those terms too general.

*The Federal Courts' Application of the Set-off Rules*

When I addressed the issue of set-off rules in *Atlantic Financial,* the district courts of the Ninth Circuit led by *Bennett* followed the *pro tanto* rule and the district courts of the Second Circuit led by *First Federal* followed the capped comparative fault rule.

Since then the Ninth Circuit in *Kaypro* has ignored *Bennett* and has imposed the pure comparative fault rule.

The Second Circuit also addressed the issue in *Singer.* The opinion in *Singer* presents some difficulty because it did not cite *First Federal* or use the common names of the set-off rules. Instead the court embraced the "one satisfaction rule." 878 F.2d at 600. The court described the "one satisfaction rule" as requiring the set-off of "the settlement amount," i.e., a *pro tanto* rule. 878 F.2d at 600. The court created a risk of confusion, however, because it also cited N.Y.Gen.Oblig.Law § 15–108 as an example of the "one satisfaction rule." The cited statute in fact provides for a "capped comparative fault" rule. In upholding the ruling of the district court, the Court of Appeals for the Second Circuit actually applied the *pro tanto* rule, allowing a set-off of the actual amount of the prior settlement, dollar for dollar. I conclude that the court's position should be derived from its actual order, not from its casual inclusion, at the tag end of a string of citations, of a reference to the New York statute. In the one reported case from the Second Circuit since *Singer,* the district court noted that the New York statute was cited in *Singer,* but the question of set-off not yet being ripe, no decision was made. *Duttle v. Bandler & Kass* No. 82 Civ. 5084, slip op., 1990 WL 52147 (S.D.N.Y.April 17, 1990) (U.S.Dist.Lexis 4364). In my opinion, the *pro tanto* rule is the rule in the Second Circuit. Given the volume of securities litigation in that circuit, its opinions are entitled to considerable weight.

Outside of the Second and Ninth Circuits, no other court of appeals has dealt with the issue of set-offs in securities actions. Two district courts have decided against the *pro tanto* rule in favor of one of the comparative fault rules. *In Re Sunrise Secur. Litigation,* 698 F.Supp. 1256 (E.D.Pa.1988) (pure comparative fault rule); *Alvarado Partners, L.P. v. Mehta,* 723 F.Supp. 540 (D.Colo.1989) (capped comparative fault rule). Apart from my opinion in *Atlantic Financial,* only two additional district courts support the *pro tanto* rule. *In Re Terra–Drill Partnerships Secur. Litigation,* 726 F.Supp. 655 (S.D.Tex.1989); *Dalton v. Alston & Bird,* 741 F.Supp. 157 (S.D.Ill.1990) (interpreting *Singer* as embracing the *pro tanto* rule because it cites the Illinois statute).

In summary, the Ninth Circuit and the Eastern District of Pennsylvania support the pure comparative fault rule. The District of Colorado supports the capped comparative fault rule. The Second Circuit and the Southern Districts of Texas and Illinois support the *pro tanto* rule.

*The Policy Arguments*

*Pro Tanto versus a Comparative Fault Rule*

In *Atlantic Financial,* I reviewed various policy reasons for embracing the *pro tanto* rule over a comparative fault rule:

The "comparative fault" rule avoids the need for a pretrial determination of the fairness of. the proposed partial settlement, because all interested parties have the opportunity to argue the issue of relative fault.... While using this approach has some appeal because it avoids the need for a pretrial hearing, it merely pushes the same issues forward into an already complex and confusing trial. Delaying final determination of the amount of the set-off deprives the plaintiff class of one of the chief inducements to settle: certainty. Particularly in class actions, this method generates significant practical difficulties as well, in that the indeterminate impact of any particular settlement would make it difficult to frame a notice to the class which fairly presents the merits of the proposed settlement. Furthermore, in complex securities litigation, the burden on the jury's time and perception is already considerable. To

add to this burden the task of apportioning fault between absent and present defendants would obviate much of the advantage of partial settlement to the judicial system itself.

718 F.Supp. at 1018.

On the other hand, courts following the comparative fault rules have disputed the usefulness of the *pro tanto* rule. In the court's opinion in *Kaypro*, the good faith hearing could not effectively prevent the potential collusion between the plaintiff and the settlor, to the disadvantage of the non-settling defendants. The *pro tanto* rule promotes settlement by removing all risk from the plaintiff. To be truly efficacious in preventing collusion, the hearing would require "bogging down the settlement process in a miniature trial before trial." *Donovan v. Robbins*, 752 F.2d 1170, 1181 (7th Cir.1985). A comparative fault rule would remedy this concern, by placing increased risk on the plaintiff. If the settlement did not fairly represent the settlor's culpable share, then the plaintiff would lose the opportunity to recover the remaining share.

This perspective of risk analysis led the *Sunrise* court to suggest that the only settlements that the *pro tanto* rule promotes, beyond those promoted by a comparative fault rule, are bad ones. Additionally, the *Kaypro* court asserted that the *pro tanto* rule's concern that the plaintiff be made whole is misplaced, since the plaintiff voluntarily agreed to the settlement. Both these arguments stem from a misunderstanding of the relationship among the *pro tanto* rule, joint and several liability, and the right to contribution. The *pro tanto* rule promotes the policy of allowing the plaintiff to choose from which defendant it may collect. However, by extinguishing the non-settling defendants' right to contribution, the settlement might disturb the equity among wrongdoers. In the face of these two competing objectives, the two courts reasoned that the *pro tanto* rule may promote bad settlements or unreasonably allow the plaintiff to be made whole. If collusion is the problem, however, the comparative fault rule does not resolve it, because it encourages the non-settling defendants to gang-up on the settling defendant, who is absent from and unrepresented at trial. This could lead to an unfair diminution of the verdict.

The court in *Kaypro* criticized the *pro tanto* rule because it will encourage plaintiffs to go after wealthy defendants rather than the less wealthy. Even if no settlement is approved, however, this will be the situation when the plaintiff seeks to levy execution on the judgment, since liability under the statute is several as well as joint.

Additionally, *Kaypro* asserts that even without collusion, the *pro tanto* regime systematically penalizes the non-settling defendants. Pointing to the rule that courts are instructed to allow discounting in settlement for saved litigation expenses, *Kaypro* concludes that the discount is automatically charged to the non-settling defendants. The court neglects the fact that both the plaintiff and the settlor save litigation expenses by settling. Consequently, the litigation savings provide a range on either side of that figure in which the parties may compromise. It is mathematically incorrect that "non-settling defendants are forced to pay the plaintiff the amounts of the discount." 884 F.2d at 1228.

Finally, *Kaypro* endorses the comparative fault rule because it promotes settlement as a method for parties to manage their own disputes in privacy without judicial intervention. D. Provine, *Settlement Strategies for Federal District Judges* 1–2 (1986).

*The Capped versus Pure Comparative Fault Rule*

The dispute between the capped and the pure comparative fault rule focuses on the possibility that the plaintiff may collect more than was awarded at trial. The scenario involves a plaintiff settling with a defendant for more than its share, as it is later determined at trial. Under the pure comparative fault rule, the total which the plaintiff then collects will be greater than if it never settled. The Second Circuit argues that this scenario would violate the one satisfaction rule. The Ninth Circuit takes the opposite position.

[W]e do not believe that the plaintiffs in the above scenario have received more than one satisfaction for the same injury. All of the defendants are required to contribute, none pay the entire damages. The plaintiffs are merely receiving more money than they *might* have in different circumstances. If all of the defendants had settled for a sum larger than the trial verdict, the one satisfaction rule would not be violated. There is little conceptual difference between that and only some of the defendants settling for a larger amount.

884 F.2d at 1232.

The comparative fault rule takes as its fundamental premise that the plaintiff and the settling defendant are negotiating about that defendant's share of liability. If the plaintiff extracts a favorable settlement for that defendant's personal, not joint, liability and later is awarded a judgment for the remaining defendants' personal liability, no excess award appears to be collected. Additionally, it appears reasonable that if the plaintiff is allowed to settle for a figure below its fair share, because it is saving litigation expenses, then the defendant may also reasonably pay more than its fair share to save its own litigation expenses. Consequently, the pure comparative fault rule applied in *Kaypro* is a better alternative than the capped comparative fault rule.

*Summary*

The advantages of the *pro tanto* rule are that it allows certainty to the remaining parties about the amount of the set-off. The certainty argument carries the most weight in class action suits like *Atlantic Financial:* "Delaying final determination of the amount of the set-off deprives the plaintiff class of one of the chief inducements to settle: certainty. Particularly in class actions, this method generates significant practical difficulties as well, in that the indeterminate impact of any particular settlement would make it difficult to frame a notice to the class which fairly presents the merits of the proposed settlement." 718 F.Supp. at 1018. Additionally, under Fed.R.Civ.P. 23(e), the court is already involved in determining the fairness of the settlement. The court "is to protect the nonparty members of the class from unjust or unfair settlements affecting their rights when the representatives become faint-hearted before the action is adjudicated or are able to secure satisfaction of their individual claims by compromise." 7B C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1797, at 340–41 (1986). Not only does the court need to look at the class' interest, but also "the court should consider whether approving the proposal will result in unfair prejudice to the remaining defendants." *Id.* § 1797.1, at 408. Consequently, in class action suits, the *pro tanto* rule will not additionally burden the courts in policing settlements, and at the same time, it will ease notification of and comprehension by the class members of the terms of the partial settlement.

On the other hand, the major advantage of a pure comparative fault rule is the absence of a fairness hearing. The absence of a fairness hearing may conserve judicial time, promote settlements without judicial aid, and avoid the difficulty of conducting a hearing in the early stages of litigation. The pure comparative fault rule also leaves the burdens of obtaining an adequate settlement on the plaintiff and the settlor, not on the non-settling defendants. Lastly, the First Circuit has admonished that the seventh amendment right to a jury trial attaches to a determination of the right of contribution at trial. *In Re N–500L Cases,* 691 F.2d 15 (1st Cir.1982). Unlike a contribution determination at trial, a fairness hearing looks at the relative shares among the wrongdoers as a necessary but only secondary component of the equity of a settlement. *See In Re MGM Grand Hotel Fire Litigation,* 570 F.Supp. 913, 927 (D.Nev.1983). The concern for ensuring that the jury ultimately determines the facts, however, does support adopting the pure comparative fault rule.

As in *Atlantic Financial,* I continue to perceive the *pro tanto* rule as bringing increased certainty to the settlement process in complex securities class actions.

The federal common law of settlement approval in securities fraud cases can reflect the increasingly public law aspects incumbent in class actions by continuing to apply the more judicially interventionist *pro tanto* rule. *See generally* A. Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L.Rev. 1281 (1976).

## II. Contribution Bar for Massachusetts Claims

### Preemption of the State Rule by the Uniform Federal Rule

■ *Nelson v. Bennett* discounted the conflict created by establishing a separate uniform federal rule.

> [P]ractical difficulties in application will arise not in the majority of cases, but only in those particular narrow instances where (1) both state and federal claims are asserted in a single action, (2) the state provides a settlement bar statute, *and* (3) the state statute and the federal rule vary significantly.

662 F.Supp. at 1337.

However, this situation could now exist in this case and did exist in California with *Kaypro*. Those "particular narrow instances" have now blossomed and the consequence of differing state and federal rules must be seriously considered.

*Bennett* asserted that differing standards will not in general be disruptive of the state policy. In contrast, *First Federal* stated succinctly the potential difficulties of differing state and federal settlement rules:

> Where a federal securities law and a state law claim are based on the same tortious conduct, as discussed above, it is not clear how disparate rules of contribution—barring contribution on the state and permitting it on the federal claims—would be applied to a jury verdict awarding identical damages on both claims, unless the state bar on contribution is to be completely overridden. A different but related problem is created regarding the appropriate setoffs to be granted on

the state law claim to the non-settling defendants.

631 F.Supp. at 1036.

While both the Second and Ninth Circuits have endorsed a uniform settlement rule for federal securities law, neither court nor their respective district courts have discussed this problem. This lack of guidance is particularly striking in the Ninth Circuit, where the state and federal rules diverge.

Although both state common law and Rule 10b–5 redress the same wrong, the federal cause of action is now generally perceived as being procedurally more advantageous and substantively broader. *See, e.g.,* A. Jacobs, *Litigation and Practice under Rule 10b–5* § 11.01 at 1–299, 1–300 (1987) (citing *Hooper v. Mountain States Secur. Corp.*, 282 F.2d 195, 201 (5th Cir.1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); *Weinberger v. Kendrick*, 698 F.2d 61, 78 (2nd Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983)). The Rule 10b–5, common law, and blue sky law claims have been pleaded frequently as parallel causes of action for the same harm. Plaintiffs have recovered either under all the theories or under whichever theory provided the broadest opportunity for redress given the fact situation. Federal securities law has not preempted the state causes of action.

Whatever uniform federal rule is applied, it will be in conflict with one or another of the many diverse state statutes. If the plaintiff were allowed to recover under a state law claim whenever that award exceeded the federal award, then the state law would disrupt the federal policies behind the contribution bar and the pure comparative fault set-off rule. The federal policy of promoting settlements and conserving federal judicial resources would be disturbed. "The Supremacy Clause of Article VI of the federal Constitution prevents the states from impinging overmuch on federal law and policy." *Securities Industry Assoc. v. Connolly*, 883 F.2d 1114, 1117 (1st Cir.1989) (citing *Louisiana Pub. Serv. Commission v. FCC*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986)).

"[E]ven where Congress has not entirely displaced state regulation in a particular field, state law is preempted when it actually conflicts with federal law. Such a conflict will be found 'when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.' " *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988) (citations omitted). In any case it would be impossible to comply with both laws, and if the plaintiff were able to collect a greater state award, the federal policies would be frustrated. The uniform federal rule of contribution bars and set-off calculation preempt the application of the Massachusetts *pro tanto* rule to the state law claims.

*Conclusion as to Applicable Law*

■ It is apparent from the foregoing that, as much as everyone applauds the idea of a uniform federal law governing contribution bars and the concomitant method of set-off, no uniformity yet exists. This means that, although I too am in favor of uniformity, I am free to press my views as to what that uniform rule should be. In my opinion it should be the *pro tanto* rule for the following reasons:

1. It offers an inducement to plaintiffs to settle.
2. It is clearly the best rule in class actions, which have a very important role to play in securities litigation.
3. It is apparently the rule in the Second Circuit, which handles a large volume of securities litigation.
4. The admitted risk of inequity is not demonstrably worse than similar risks in the several versions of comparative fault rules.

Accordingly, I rule that the proposed settlement will operate as a bar to contribution, and as a *pro tanto* set-off against any liability of the non-settling defendants, provided that I find the settlement to be fair.

III. The Settlement

■ The settlement between MFS and Stephens requires the "approval of the settlement by the United States District Court, District of Massachusetts, both under state laws as having been entered in good faith and under federal law as being fair and reasonable." The parties have submitted documentary evidence concerning the fairness of the settlement.

The settlement agreement provides that Stephens pay $297,150, the amount of the fee that it collected on the disputed transaction, to MFS. MFS will also use its best efforts in the next two years to hire Stephens for the sale of securities, to generate $100,000 in fees for Stephens. The provision to use best efforts does not obligate MFS "to purchase securities that do not meet their investment objectives or strategies in effect from time to time or that are not on the most favorable terms obtainable by Plaintiffs, such decisions being exclusively within the Plaintiffs' sole discretion." Additionally, MFS would be receiving services for the payment of fees. Consequently, these future commissions need not be deducted from the set-off figure. The amount of set-off to which the non-settling defendants would be entitled should plaintiffs secure a judgment against them is $297,150.

The remaining question is whether this set-off is fair to the non-settling defendants, AMI and its wholly-owned subsidiary Brookwood [hereinafter I refer to them together as AMI]. In *Atlantic Financial*, I looked at several factors to assess fairness: the ability of the settlor to pay a larger judgment, the damages attributable to the settlor, the relative culpability between the defendants, the strength of the liability case, and the participation of a magistrate or judge in the settlement negotiations. As a class action settlement, the analysis in *Atlantic Financial* incorporated both the fairness of the settlement to the plaintiff class and to the non-settling defendants. In the present case, I need look only at the fairness to the non-settling defendants.

*Ability to Pay and Participation by a Judge or Magistrate*

Stephens as the nation's thirteenth largest investment bank indisputably has the

ability to pay the full judgment, if the case went to trial. Neither I nor a magistrate participated in the settlement negotiations. These facts do not speak for the settlement, nor do they necessarily provide a basis for finding it unfair.

### Damages Attributable to Stephens

The complaint demands either rescission of the purchase or damages of $8.49 million. From this perspective, the settlement figure represents 3.5% of the demand.

AMI correctly notes that the rescission claim is not asserted against itself, but only against Stephens. The damages recoverable from AMI are measured by the difference between the price paid on the bonds and the value absent the omission on the closing date. MFS bought the bonds at 100% of face value. Afterwards the bonds were valued by MFS upward to 109⅜%. Upon discovering the earlier departure of Dr. Roberson, MFS devalued the bonds to 90%. MFS then filed this suit. MFS received further adverse news during the pendency of the case: they could no longer expect full interest payments from FHI. The bonds were further devalued to 80%. Recently, the rating increased to 83.5% in the expectation of this settlement. According to these valuations, the value of the bonds dropped from 109⅜% to 90%, i.e. 19⅜% or $1.655 million, upon the discovery of Dr. Roberson's departure. Against this measure of damages, the set-off constitutes 18%. MFS used an elaborate procedure to verify these valuations and has a duty to its shareholders to reflect accurately the value of its assets. These valuations, consequently, provide a dependable estimate of damages for determining the fairness of the settlement.

AMI argues that because Stephens, and not AMI, is liable for rescission, Stephens' settlement is inadequately low. However, in this fairness hearing, I am not concerned that the plaintiff is foregoing its only rescission claim for 3.5% of the potential liability. MFS, a sophisticated litigant, can adequately protect its interest in negotiation. The question is whether a set-off against an estimated money judgment is sufficient to protect the non-settling defen-

dant. The proper comparison is whether an 18% set-off is fair to AMI, not whether 3.5% of the value of rescission is fair to MFS.

### Relative Culpability and Strength of Liability Case

Facts

In the transaction, Stephens found a buyer for the bonds (MFS), aided FHI in presenting the deal to MFS, contracted with the Louisiana State Bond Commission and the Louisiana Public Facilities Authority to purchase the bonds, prepared the Limited Offering Memorandum, and sold the bonds to MFS. The purchase and re-sale of the bonds occurred at the closing on July 29, 1987. The questions of which participants knew of Dr. Roberson's departure and what duties each had determine their relative culpability.

The evidence is strong that AMI knew of Dr. Roberson's departure prior to the closing. In numerous discussions and correspondences, AMI's Southern Regional Director, AMI's Executive Director at the Hospital, AMI's Assistant Vice President, acting as "point person" on the transaction, and the Hospital's Board of Directors had knowledge of Dr. Roberson's departure and the fact that he was the Hospital's main admitter. They conveyed this knowledge to FHI, but not to Stephens or MFS.

Although officers of AMI knew otherwise, AMI made at least two representations to Stephens and MFS that Dr. Roberson was still working at the Hospital. Through a questionnaire signed by Mr. Athans, AMI's Southern Regional Director, AMI stated to Stephens that Dr. Roberson was on staff. The questionnaire states that any change in the information will be updated in writing. Notification of Dr. Roberson's departure was not made to Stephens. The Stock Purchase Agreement, which was revised at the closing and prepared by AMI and FHI, listed Dr. Roberson as being on staff under letter of agreement.

In its defense, AMI asserts that Mr. Athans, who acquired knowledge of Dr. Roberson's departure, did not actually pre-

pare the answers. Ms. Jervay, AMI's Senior Corporate Counsel, affirms that the legal department under her direction completed the questionnaire. The legal department did not receive knowledge of Dr. Roberson's departure. While this evidence may present a material issue of fact whether AMI knowingly misrepresented relevant information, it does not create a good faith defense where "a defendant genuinely forgot to disclose information or that it never came to his mind...." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 n. 20 (7th Cir.1977), *cert. denied Meers v. Sundstrand Corp.*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

Stephens' alleged knowledge is based on two pieces of evidence. The non-settling defendant points to a statement by FHI's Mr. Cribb: "I think I mentioned [Dr. Roberson's departure] to [Stephens'] Loy Deloney, although I may not have mentioned Roberson by name." AMI's Ex. E at 53. Additionally, it relies on the July 24, 1987 letter of Mr. Deloney to MFS' Ms. Dangerfield predicating the sale of bonds on five points:

1. AMI and Forum Health Investors of Georgia, Inc. (FHI) have supplied me with information which has been included in the Limited Offering Memorandum.

2. You have received directly from AMI and FHI additional information on Riverside Hospital and FHI.

3. You have done your own due diligence, and you are not relying on due diligence done by Stephens, Inc.

4. It is my understanding that you do not presently intend to distribute the bonds to any other purchasers outside the funds managed by MFS.

5. In my review of the Limited Offering Memorandum nothing has come to my attention of any misstatement of a material fact or omission of a material fact.

AMI's Ex. Q.

AMI interprets this letter as an indication that Stephens realized that the deal was flawed and wanted to wash its hands of it.

Additionally, AMI contends that Stephens insufficiently investigated the transaction, by relying solely on the representations of AMI and FHI. Stephens never inspected the site. AMI also asserts that since the list of doctors, which was submitted with the questionnaire, was dated July 1986, Stephens should have checked on its reliability in July 1987.

Stephens counters these assertions and evidence. Mr. Deloney denies that he was informed of the doctor's departure. Additionally, Stephens points to the letter of July 24, 1987 as another indication of the arms-length nature of the transaction, involving no fiduciary duties. Its reliance on questionnaires as the means of investigation was either permissible or at worst negligent conduct, not sufficiently purposeful to incur Rule 10b–5 liability.

*Liability*

Under Rule 10b–5 both Stephens and AMI are held to the same standard of care to prevent fraud. Each defendant would be liable for the knowing or reckless misrepresentation or omission of a material fact. The standard for recklessness has been summarized by the Second Circuit as the defendant's failure or refusal, "after being put on notice of a possible material failure of disclosure, to apprise themselves of the facts where they could have done so without any extraordinary effort." *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 (2nd Cir.1973). Both Stephens and AMI have put forth sufficient facts to create a material issue of fact as to their scienter and the materiality of Dr. Roberson's departure to MFS's decision to purchase the bonds. The evidence indicates a strong case for finding that AMI intentionally or recklessly withheld the information to assure that it would be able to sell the failing hospital, whereas much weaker evidence indicates any cooperation, either intentional or reckless, by Stephens in the misrepresentations. In addition to the 10b–5 claim, MFS asserts warranty claims against AMI, but not against Stephens. The representations given by AMI provide another avenue for finding liability. Additionally, the settlement represents a substantial set-off against any likely recovery against AMI and the settlement discussions give no indication of collusion. In light of these factors it is reason-

able and fair that the non-settling defendant remain exposed to potential 80% liability.

Accordingly, defendant Stephens' motion for approval of the settlement and an order dismissing and barring any claims for contribution is allowed.