**The SOUTH CAROLINA NATIONAL BANK, et al., Plaintiffs,**

**v.**

**C. Donald STONE, et al., Defendants.**

**Civ. A. No. 7:88–791–17.**

United States District Court,
D. South Carolina,
Spartanburg Division.

Aug. 20, 1991.

C. Donald Stone, pro se.

Buchanan & Co., pro se.

Robert M. Buchanan, pro se.

Unico Development Services, Inc., pro se.

Robert Lowry Wylie, III, Law Office, Greenville, S.C., for United Medical & Surgical Supply Corp.

Kenny O. Merritt, pro se.

Gregory Alan Morton, Donnan & Morton, Greenville, S.C., for James Aaron Stone.

B. Joel Stoudenmire, John A. Hagins, Jr., Brown & Hagins, P.A., Greenville, S.C., for C. Benjamin Smith, Ann H. Smith, Benan, Inc.

Retirement Horizons, Inc., pro se.

John J. Bandy, Sr., pro se.

Tom L. Sizemore, pro se.

Steven Edward Farrar, Robert Frank Plaxco, James H. Watson, Greenville, S.C., for Horace C. Smith, Whiteside, Smith, Jones & Duncan.

Nathaniel Heyward Clarkson, III, Greenville, S.C., for J.W. Wakefield.

Harold Fleming, pro se.

Joseph M. Jenkins, Jr., Greenville, S.C., for J.R. Randall.

Theodore Sanders Stern, Jr., Greenville, S.C., for Parker & Kotouc, Thomas Kotouc.

Thomas Kotouc, pro se.

S. Keith Hutto, Walker DuVall Spruill, Columbia, S.C., for Low & Furby, John T.C. Low.

Geoffrey B. Schwartz, Huey, Guilday, Kuersteiner & Tucker, Tallahassee, Fla., William Jordan, Greenville, S.C., Wilmot B. Irvin, Robert Erving Stepp, Columbia, S.C., for Mayzima & Co., Judith Baker, Maurice A. Barineau, Lawless J. Barrientos, William J. Boshell, Edwin Chase, Redford A. Cherry, Frederic E. Dehon, Charles B. Eldridge, Rene G. Fernandez, William L. Gaddoni, Harry G. Harrell, David M. Johnston, Robert L. Johnson, Kathryn F. Krause, Charles L. Lester, S. Jock McElroy, Robert D. May, Ronald R. Moats, Robert E. Salveson, William Schapley, Marvin Shams, Roy E. Southwick, John P. Thomas, John P. Vodennicker, Wallis L. Walker, Jr., Robert B. Weir, David P. Yon, John A. Yonkosky, William A. Walter, Richard M. Young, Donald A. Zima.

Vessie Jean Burkins, Columbia, S.C., Robert Julian Thomas, Columbia, S.C., for

William E.S. Robinson, Robinson, Mendoza, Barton & McCarthy.

Heyward E. McDonald, Columbia, S.C., for Wyche, Burgess, Freeman & Parham.

Heyward E. McDonald, Roger E. Warin, Steptoe & Johnson, Washington, D.C., for Eric B. Amstutz.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

The May Zima defendants [1] and individual defendant Jimmy R. Randall have entered into settlement agreements with the plaintiffs. The court on December 3, 1990, granted preliminary approval of the settlements, tentatively certified a class of plaintiffs for purposes of implementing the settlements, and authorized the sending of notice of the proposed settlements to the class members. The settling parties now ask the court to approve the settlement pursuant to FED.R.CIV.P. 23 as being fair, reasonable and adequate. Further, the settling parties ask the court to enter an order barring cross-claims by non-settling defendants against the settling defendants (the "Bar Order"), the entry of which is a condition to the effectiveness of the settlement agreements.

## BACKGROUND

The facts and history of this litigation have been set out in prior orders of this court. *South Carolina Nat'l Bank v. Stone*, 749 F.Supp. 1419 (D.S.C.1990). It suffices here to say that this is a complex class action securities fraud case involving the sale of $16 million principal amount of municipal bonds issued in 1985 to finance the construction and operation of a retirement center in Spartanburg, South Carolina. The project failed to achieve its projected occupancy and revenues, and the indenture trustee foreclosed on the project,

1. As used in this opinion, the term May Zima defendants shall include May Zima & Co. and the following former accountants affiliated with that firm: Judith Baker; Maurice A. Barineau; William J. Boshell; Edwin R. Chase; Redford A. Cherry; Charles B. Eldridge; Rene G. Fernandez; William L. Gaddoni, CPA; Harry C. Harrell; Robert L. Johnson; David M. Johnston; Charles L. Lester; Robert D. May; Ronald R. Moats; Robert E. Salveson; William Schapley; Marvin D. Shams; John P. Thomas; John P. Vodenicker; Wallis L. Walker, Jr.; David P. Yon; John Yonkosky, CPA; Richard M. Young and Donald P. Zima.

resulting in significant losses to the investors who had purchased the municipal bonds.

The accounting firm of May Zima & Co., which has entered into one of the settlement agreements at issue, prepared the feasibility study on the retirement center which was delivered to prospective purchasers of the bonds. Defendant Jimmy R. Randall, the other settling defendant, was an officer and director of Heritage Living Centers, Inc., a marketing agent for the retirement center financed by the bonds.

## TERMS OF THE PROPOSED SETTLEMENT

The settlement agreements provide that the May Zima defendants will pay $750,000, and J.R. Randall will pay $75,000, for a total of $825,000, into an interest bearing escrow fund for the benefit of the class.

The parties to the settlement have made it a condition to the effectiveness of the settlement that the court certify a class of plaintiffs for purposes of the settlements and also enter a Bar Order barring the assertion of cross-claims by non-settling defendants arising out of this case. The Bar Order proposed by the parties provides that if a judgment is entered against non-settling defendants, those non-settling defendants would be entitled to a credit against that judgment, which shall be determined at the time of trial or judgment based on controlling legal principles in effect at that time. The settlement agreement provides for dismissal of all claims that plaintiffs and the class members have brought, or could have brought, against the settling defendants, and for specified mutual releases among the settling defendants (including any subsequently-settling defendants).

2. Moreover, contemporaneously with the issuance of this order, the court is issuing its opinion granting the plaintiffs' outstanding motion for class certification.

3. Although the retirement center whose construction was financed by these bonds is located

## PROVISIONAL CERTIFICATION OF THE CLASS FOR SETTLEMENT PURPOSES

The propriety of certifying plaintiff classes for the purposes of implementing settlements is well-recognized. *See, e.g., In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 177–78 (5th Cir.1979), *reh'g denied*, 609 F.2d 1008 (5th Cir.1979), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); *South Carolina Nat'l Bank v. Stone*, 749 F.Supp. at 1428. The plaintiffs' claims against the settling defendants are entitled to and will be certified as class actions under Rule 23(b)(3).[2]

## ADEQUACY OF CLASS NOTICE

In its order granting preliminary approval of the proposed settlements, this court also approved the form of notice prepared by class counsel to be sent to the known class members and a form of summary notice to be published in The Wall Street Journal. The court finds that the class notice to the known class members was properly mailed and that the summary notice was properly published in The Wall Street Journal, all in accordance with the court's instructions. Such notice constituted the best practicable notice under the circumstances and fulfilled all requirements of Rule 23 and due process of law.[3]

## RULE 23(e)—FAIRNESS TO THE CLASS

Rule 23(e) provides that a class action may not be compromised without the approval of the court. The standards to be applied in determining whether to approve settlement of class actions are well established. *See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158–59 (4th Cir.1991). Courts generally look to the following factors:

1. Whether the settlement was the product of good faith bargaining, at arm's length, and without collusion;

2. The relative strength of the parties' cases as well as the uncertainties of

in Spartanburg, South Carolina, the bonds were marketed nationwide. Accordingly, it was deemed more appropriate to publish notice of the proposed settlements in The Wall Street Journal than in local newspapers because the bondholders are found all across the country.

litigation on the merits and the existence of difficulties of proof or strong defenses which the plaintiffs are likely to encounter if the case proceeds to trial;

3. The complexity, expense and likely duration of additional litigation;

4. The solvency of the defendants and the likelihood of recovery on a litigated judgment; and

5. The degree of opposition to the settlement by class members.

*Jiffy Lube,* 927 F.2d at 159. *See also Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *South Carolina Nat'l Bank v. Stone,* 749 F.Supp. at 1423; *In re Montgomery County Real Estate Antitrust Litig.,* 83 F.R.D. 305 (D.Md.1979). For the reasons set forth herein, the court is satisfied that the proposed settlement satisfies each of these criteria.

**1. Settlement was the Product of Good Faith Bargaining, at Arm's Length, and Without Collusion**

In assessing the fairness and adequacy of a proposed settlement, "there is a strong initial presumption that the compromise is fair and reasonable." *In re Saxon Sec. Litig.,* [1985–86 Transfer Binder] F.Sec. L.Rep. (CCH) ¶ 92,414, at 92,525, 1985 WL 48177 (S.D.N.Y.1971) (quoting *Katz v. E.L.I. Computer Sys., Inc.,* [1970–71 Transfer Binder] F.Sec.L.Rep. (CCH) ¶ 92,-994, at 90,676, 1971 WL 251 (S.D.N.Y.1971)). Courts have recognized that "[s]ettlements, by definition, are compromises which 'need not satisfy every single concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits.' " *In re Saxon Sec. Litig., supra,* ¶ 92,414, at 91,525 (quoting *Alliance to End Repression v. Chicago,* 561 F.Supp. 537, 548 (N.D.Ill.1982)).

The Fourth Circuit has listed four factors that a court should consider in concluding whether a proposed settlement agreement was reached in good faith and without collusion:

1. the posture of the case at the time the settlement was proposed;

2. the extent of discovery that had been conducted;

3. the circumstances surrounding the negotiations; and

4. the experience of counsel in the area of securities class action litigation.

*Jiffy Lube,* 927 F.2d at 159.

Upon an analysis of these factors, it is clear that these proposed settlements were entered into in good faith, at arms' length, and without any collusion. All defendants had answered the complaint and all motions to dismiss had been ruled upon at the time of these settlements. Further, discovery was largely completed as to all issues and parties. As a result, plaintiffs' counsel were fully informed of the parties' positions and of the evidence, or lack thereof, in support of such positions.

The settlement discussions involved here were, at times, supervised by a magistrate judge and were hard fought and always adversarial. The negotiations in this case were conducted by able counsel who have a substantial amount of litigation experience in this sort of complex securities action. Finding no indication of any collusion, it is therefore appropriate for the court to give significant weight to the judgment of class counsel that the proposed settlement is in the interest of their clients and the class as a whole.

**2. Relative Strengths of the Parties' Cases and the Uncertainties of Litigation on the Merits**

Although a court is not to decide the merits of the case or to attempt to resolve unsettled factual or legal questions when reviewing the adequacy of a proposed settlement, *see Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981) (citing *Protective Comm. for Indep. Stockholders v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968)), it is nonetheless necessary in order to evaluate the fairness and adequacy of a settlement to assess the relative strengths and weaknesses of the settling parties' positions. *See Flinn,* 528 F.2d at 1172.

An evaluation of the relevant pleadings filed with the court reveals that the strengths of the claims and defenses asserted have been the subject of substantial dispute since the inception of this litigation. The risks to plaintiffs on the legal and factual issues raised also militate in favor of settlement.

To prevail on their Rule 10b–5 claims and the common law fraud claims, plaintiffs must survive a pending summary judgment motion based on the statute of limitations as to the 10b–5 claims and must establish, among other things, that the settling defendants acted with scienter and that the alleged misstatements and omissions were the proximate cause of the project's failure. Settling defendants strongly dispute plaintiffs' ability to prove either scienter or causation.

These examples of the settling defendants' positions and defenses, though indicative of the obstacles and road blocks in the plaintiffs' path, do not mean that the court has determined that the plaintiffs could not overcome such difficulties and prove their case at trial. The court need not resolve these issues for purposes of this motion, but notes that the ultimate resolution of the numerous and significant factual and legal issues poses risks to both sides. Based on these factors, the court is satisfied that the amounts paid into the settlement by each of the settling defendants are fair and adequate.

### 3. Complexity, Expense, and Likely Duration of Additional Litigation

"[A]n integral part of the strength of the case on the merits is a consideration of the various risks and costs that accompany continuation of the litigation." *Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, 309 (7th Cir.1985) (citing *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 124 (8th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)). Other courts recognize "that stockholder litigation is notably difficult and notoriously uncertain." *Lewis v. Newman,* 59 F.R.D. 525, 528 (S.D.N.Y.1973).

Although the plaintiffs in this, as in any case, may firmly believe that their claims have merit, the complexities and uncertainties characteristic of class action securities litigation, and the associated expenses of such litigation, make it appropriate for such plaintiffs to compromise their claims pursuant to a reasonable settlement. *See Warren v. Tampa,* 693 F.Supp. 1051, 1059 (M.D.Fla.1988) (finding that duration, complexity and expenditures of continued litigation of claims supports approval of a proposed settlement), *aff'd,* 893 F.2d 347 (11th Cir.1989). In addition to the numerous hours worked by counsel since the case was filed, substantial additional work can be expected if this case goes to trial against these settling defendants. Although plaintiffs have expressed their intention to continue to pursue their claims against the non-settling defendants, many additional hours would have been required to prepare and respond to anticipated summary judgment motions, and to try the case against the settling defendants. Settlement under these circumstances clearly is appropriate.

### 4. Solvency of the Defendants and the Likelihood of Recovery if the Case Goes to Trial

When comparing the amount of the settlement with the potential liability of the settling defendants, it is also appropriate to consider those defendants' abilities to pay any subsequent judgment and the availability or lack thereof of insurance proceeds. *See Jiffy Lube,* 927 F.2d at 159.

The May Zima defendants have a $5 million insurance policy; however, it is a so-called "wasting coverage" policy in which the policy limits are reduced by defense costs. As of the date of the settlement hearing, all of the policy had been used for other settlements or defense costs in this and other cases except for a small amount above the amount of this settlement. The accounting firm of May Zima no longer exists. Plaintiffs' counsel have expressed the view, and the court agrees, that any additional sums that might be recovered by tracking down individual partners of the May Zima accounting firm and instituting

collection efforts would likely be outweighed by the additional expense of such efforts. Accordingly, the only primary source of recovery is this defunct accounting firm's dwindling insurance policy.

As to the individual settling defendant Jimmy R. Randall, it has been represented to the court that Mr. Randall has substantially depleted his financial resources. Mr. Randall has no insurance that would cover the causes of action alleged in the complaint.

Thus, it appears likely that if the plaintiffs were to proceed to trial against these defendants, even if they obtained judgements for the full amount of their damages against them, the plaintiffs would be unable to collect any more money than they are receiving in these settlements. Moreover, if the settlement is approved, the plaintiffs will have the use of that money now, as opposed to months or years from now, and will be saved the additional expense of attempting to collect a money judgment.

### 5. Degree of Opposition to the Settlement Voiced by Class Members

As stated by the Fourth Circuit, "[t]he attitude of members of the class, as expressed directly or by failure to object, after notice, to the settlement, is a proper consideration for the trial court...." *Flinn*, 528 F.2d at 1173.

In this case, approximately 2,300 class members have previously been identified from the indenture trustee's records and in connection with prior settlements. Not one class member has ever expressed to the court any objection to the settlements or any terms thereof.

### CONCLUSION AS TO THE FAIRNESS OF THE SETTLEMENT TO THE CLASS

All the factors which the Fourth Circuit in *Jiffy Lube* directed courts to consider in determining whether to approve a proposed class settlement are satisfied. The settlements will be approved contingent upon approval of the requested Bar Order extinguishing cross-claims against the settling defendants, which is a precondition to the effectiveness of the parties' settlement agreements.

### PROPRIETY OF ORDERS BARRING CROSS–CLAIMS

Because the proposed settlements do not include all remaining defendants, the settling defendants have imposed as a requirement of the settlements that the court enter an order barring cross-claims against them. Understandably, the settling defendants have no desire to pay money to the plaintiffs to settle their claims only to be brought back into the case to defend themselves on contribution or other cross-claims asserted by the non-settling defendants. This court in its prior decision on the propriety of a number of settlements in the case discussed in detail the status of the law in this area. Since that time, several other courts have approved of the use of contribution bar orders to facilitate partial settlements. *See, e.g., Jiffy Lube*, 927 F.2d 155; *MFS Mun. Income Trust v. American Medical Int'l, Inc.*, 751 F.Supp. 279 (D.Mass.1990).

### APPROPRIATE CREDIT METHOD TO BE USED IN CONNECTION WITH BAR ORDER

All the courts that have imposed orders barring cross-claims by non-settling defendants have held that such non-settling defendants are entitled to some credit or set-off against any later judgment against them in exchange for having their potential cross-claims satisfied and extinguished. *See Id.*

The Bar Order entered in this case in connection with the earlier settlements, and the Bar Order proposed here by the settling parties, provide that the non-settling defendants will receive whatever credit or set-off they may be entitled to under "applicable principles of law and equity." However, both such Bar Orders defer until the time of trial a determination of what method of computing the credit should be used.

After approval and entry of the earlier Bar Order, and after the Rule 23 fairness hearing on the May Zima/Randall settlements, the Fourth Circuit issued its *Jiffy Lube* opinion. In that case, the district court approved a settlement and entered an order barring cross-claims against the settling defendants, which like the Bar Orders entered previously in this case, deferred a decision on what credit method to adopt. The Fourth Circuit ruled that, although a court may enter an order barring cross-claims in connection with a partial settlement, it is inappropriate to defer a ruling on the appropriate credit method. Deferral of a decision on what credit method to adopt prejudices both absent class members, whose decision of whether to remain a member of the settlement class or to "opt out" of a Rule 23(b)(3) class could be affected by the credit method adopted, and non-settling defendants, whose trial preparation and strategy might be affected by the credit method used.

In light of *Jiffy Lube*, this court on March 27, 1991, heard oral arguments on which credit method ought to be adopted both for the earlier settlements and the settlements presently before the court. As noted by the Fourth Circuit, three credit methods have most often been suggested:

(1) *Pro tanto*, in which the judgment is reduced by the amount paid by the settling defendants; the non-settling defendant pays the remainder. This method exposes the non-settling defendant to liability for any deficiency in the judgment, so a hearing focussing on fairness of the settlement to the non-settling defendant is required for approval.

(2) *Proportionate fault*, in which the jury assesses the relative culpability of both settling and non-settling defendants, and the non-settling defendant pays a commensurate percentage of the judgment. Here, the plaintiffs bear the risk of a "bad" settlement and thus have incentive to obtain a settlement accurately apportioned according to fault. However, the final determination of the amount of set-off is necessarily delayed, making it difficult to frame a notice to the plaintiff class that fairly presents the merits of the proposed settlement.

(3) *Pro rata*, in which the judgment amount is simply divided by the number of defendants, settling and non-settling, that are found liable. Relative culpability is not an issue. Since the settling defendants will already have satisfied their debt to plaintiffs, the non-settling defendant may have to pay a share larger than theirs if the judgment is greater than the settlement amount. Conversely, the non-settling defendant will pay less if the judgment is less than the settlement amount.

*Jiffy Lube*, 927 F.2d at 160–61 n. 3. Of these methods, this court is of the opinion that in this instance the "pro tanto" approach best serves the primary goal of encouraging settlements and the secondary goals of providing certainty and consistency with state law provisions, and is the only credit method which reflects the ability of the settling defendants to satisfy any judgment that might later be obtained.

### 1. "Pro Rata" Method

The "pro rata" method would seem to involve a simple mathematical computation, but in practice, the method can be unpredictable. The method involves dividing the judgment by the number of liable defendants. The credit available to the non-settling, liable defendants is the figure resulting from that division multiplied by the number of settling defendants. As it cannot be known at the time of a settlement how many defendants will ultimately be found liable at trial, it is impossible to know until after trial in how many ways the judgment will be divided.

Further uncertainty is generated by the courts' discretion to lump defendants together for purposes of determining the "pro rata" credit. The court's discretion in categorizing defendants can significantly affect the amount of the credit given non-settling defendants, and hence, the plaintiffs' decision to accept or reject a settlement proposal. For example, in *McLean v. Alexander*, 449 F.Supp. 1251 (D.Del.1978), *rev'd on other grounds*, 599 F.2d 1190 (3d Cir.1979), the plaintiffs argued in connec-

tion with a partial settlement that all of the settling shareholder defendants should be treated as one entity and the remaining non-settling defendants as one entity to result in a 50% credit. The non-settling defendant argued that each individual defendant should be treated separately so that it would receive an 80% credit.

The problem is exacerbated by the fact that a court often may not be able to decide how to group the defendants until after it has heard all the evidence at trial. In *Wassel v. Eglowsky*, 542 F.2d 1235 (4th Cir.1976) (*affirming*, 399 F.Supp. 1330, 1370 (D.Md.1975)), *overruled on other grounds, Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101 (4th Cir.1989), for example, the district court lumped two of the three potentially liable parties together, resulting in a 50–50 credit. Its decision to lump those two parties together resulted from a factual finding about their relationship. *Id.* at 1370.

Finally, the "pro rata" approach fails to consider either the relative culpability or the financial circumstances of each settling defendant. The arbitrariness of the "pro rata" approach can thus result in the least culpable defendants having to bear a higher share of the damages, while the more culpable defendants can settle for disproportionately low amounts. The "pro rata" approach can also be a disincentive to settlements with defendants whose financial status is disproportionately low in comparison to their "pro rata" share of the liability.

In light of the Fourth Circuit's emphasis in *Jiffy Lube* on the need for certainty, both for the sake of the plaintiff class members who must decide whether the settlement is justified by the risk of receiving a reduced judgment at trial, and for the non-settling defendants, whose trial strategy could be affected by the method of computing the credit, the "pro rata" approach is inappropriate here.

### 2. "Proportionate Fault" Method

The "proportionate fault" method would also provide too little certainty to the settling parties. Under the "proportionate fault" method, the amount of the credit is not determined until trial. At trial, the factfinder determines the proportionate fault of the settling defendants on a percentage basis. The non-settling defendants who are adjudged liable are entitled to a credit against that judgment equal to the percentage of fault accorded the non-settling defendants. As noted by the Fourth Circuit in *Jiffy Lube*, plaintiffs may bear the risk of a "bad" settlement if the "proportionate fault" credit method is adopted. 927 F.2d at 160 n. 3.[4]

Even after completion of substantial discovery, plaintiffs are not able to predict what percentage level of culpability a jury will assign to the non-settling defendants, especially in cases where, as here, it cannot be anticipated that the settling defendants will even appear at trial. The risk that the settling defendants' settlement contribution will be disproportionate to their culpability creates especially great problems in class action securities litigation, in which the class members are not personally familiar with the development of the case. As in *Jiffy Lube*, crafting a notice to class members that discloses all the risks of the "proportionate" method would be difficult.

A key reason for settlements is to reduce the uncertainty and scope of trial. The court finds that in this instance the "proportionate fault" method is inappropriate due to the new risks and uncertainties it would create for both plaintiffs and non-settling defendants as well as the complexity it would add to trial.

### 3. "Pro Tanto" Method

The "pro tanto" method satisfies the need for certainty pointed out by the court in *Jiffy Lube*, while at the same time protecting the interests of plaintiffs and settling and non-settling defendants in this

---

**4.** There is a split among the courts which have adopted a proportionate fault approach of whether the reverse is true, i.e., whether non-settling defendants bear the risk that the plaintiffs negotiated a particularly favorable settle-

ment. The two approaches taken by the courts have been referred to as the "pure" and the "capped" proportionate fault methods. *See MFS Municipal Income Trust v. American Medical Int'l, Inc.*, 751 F.Supp. 279 (D.Mass.1990).

instance. Under the "pro tanto" approach, the non-settling defendants will receive a credit against any judgment equal to the amounts paid in the partial settlements. The "pro tanto" method therefore prevents the quandary raised in *Jiffy Lube* whereby class members are asked to approve or disapprove a settlement when they have no way of knowing how the settlement will affect any future recoveries they might obtain at trial. Likewise, it removes the uncertainty from the non-settling defendants' position. They do not bear the risk of receiving a credit of less than the amount paid in the settlement and can easily determine their potential liability and structure their defense accordingly.

## FAIR SHARE DETERMINATION

 The Fourth Circuit in *Jiffy Lube* indicated that if the "pro tanto" approach is followed, the court must afford the non-settling defendants the right to be heard on the question of whether the settling defendants have paid their "fair share" of the potential liability in the settlements. 927 F.2d at 160 n. 3. This finding precludes the making of unfairly cheap settlements. *See In re Atlantic Fin. Management, Inc. Sec. Litig.*, 718 F.Supp. 1012, 1017 (D.Mass. 1988).

Having decided to use the "pro tanto" credit method, the court on May 9, 1991, notified all former and current defendants in the case to advise them of the time and date of a hearing to determine whether the settling defendants had paid their "fair share" in their respective settlements so as to justify the requested Bar Orders. A hearing to determine the issue was held on May 23, 1991.

Courts review four factors to determine whether a proposed class action settlement involving a Bar Order is fair to non-settling defendants: (1) whether a larger judgment against the settling defendant would be collectible; (2) the strength of the plaintiffs' case against the settling defendant; (3) the settling defendants' relative culpability; and, (4) the participation of a magistrate judge or judge in the settlement negotiations. *See, e.g., MFS Mun. Income Trust v. American Medical Int'l., Inc.*, 751 F.Supp. 279 (D.Mass.1990); *In re Atlantic Fin. Management Sec. Litig.*, 718 F.Supp. at 1017.

### 1. Whether a Larger Judgment Against the Settling Defendants Would be Collectible

When, as in this case, the non-settling defendants would most likely not be able to collect any more money from the settling defendants were they to proceed to, and obtain, a judgment on their potential cross-claims, this issue seems dispositive. If a defendant pays all that he is capable of paying in a partial settlement and the non-settling defendants have any judgment against them reduced dollar-for-dollar by the amount of the settlement, the settlement is fair to the non-settling defendants because the non-settling defendants are receiving the same benefit they could receive if they succeeded on their cross-claims.

The court is satisfied that the record established at the June 12, 1990, and February 8, 1991, hearings on the fairness of the settlements to the class members under Rule 23 is sufficient to determine the same issue of fairness to the non-settling defendants. Based upon that record, the court is satisfied that all settling defendants have paid their "fair share" of the potential damages owing to the plaintiffs. As discussed at length in this court's opinion approving the settlements with the May Zima defendants and J.R. Randall as being fair to the class members, such defendants are paying in settlement all that they reasonably can be expected to pay.

### 2. Strength of the Plaintiffs' Case Against the Settling Defendants

The May Zima defendants have raised substantial defenses, including lack of causation, lack of reliance, and lack of scienter. May Zima & Co. was the feasibility consultant for the bond issue. In that role, they prepared a report on the feasibility of the proposed retirement center project, which was included as an exhibit to the Official Statement and which forecasted that the retirement center would generate sufficient revenue to repay all principal and interest on the bonds. Although disputed

fact issues may exist as to May Zima's defenses, the defenses are substantial and this court cannot say with certainty that the plaintiffs would prevail on their claims before a jury.

Mr. Randall, also, has vigorously asserted defenses of lack of knowledge or scienter, lack of duty, lack of reliance, and lack of causation. Mr. Randall headed Heritage Living Centers, Inc., a company indicated in the Official Statement as hired to assist in marketing the retirement center to the elderly. It is alleged that Mr. Randall knew that the description of his company's track record was misleading because it did not reflect that he had very little experience in marketing retirement centers. Due to his peripheral role in the overall frauds alleged in the plaintiffs' complaint, the court finds that Mr. Randall has paid a fair share of the total damages.

### 3. Settling Defendants' Relative Culpability

The potential liability of all the settling defendants is derivative of the liability of the non-settling defendants. The non-settling defendants consist primarily of C. Donald Stone, the developer of the project financed by the bonds, and Buchanan & Co., the underwriter and primary seller of the bonds. This case alleges that the Official Statement disclosing to the public the material facts about the bond issue was prepared by, or at the direction of, the underwriter. That Official Statement omitted numerous material facts about Mr. Stone and his past track record and dealings. The lawyers, all of whom have settled previously, were sued for not discovering and disclosing these allegedly material facts.

A comparison of the potential liability of Mr. Stone, the person who allegedly orchestrated the undisclosed fraudulent activities, with that of the professionals who allegedly failed to learn of or disclose Mr. Stone's frauds, or with the liability of the individuals Mr. Stone employed and used to carry out his plans, indicates that the bal-ance of potential culpability tips toward Mr. Stone, a non-settling defendant. Similarly, Mr. Bob Buchanan and Buchanan & Co. served as the underwriter and primary seller of the bonds to the investors. It was the underwriter's responsibility, more so than any other party to the bond issue, to conduct "due diligence" to investigate and disclose all material facts surrounding the issuance of the bonds. "Municipal Securities Disclosure," Exchange Act Release No. 26,100 [1988–89 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 84,326 (Sept. 22, 1988). Although underwriter's counsel may have acted as the agent for Buchanan in connection with the due diligence investigation and preparation of the Official Statement, Buchanan remained the principal and may not delegate away its responsibility under the law. *Id.* The allegations described above of Mr. Randall's liability pale in comparison to those of non-settling defendants C.D. Stone and Bob Buchanan, who are alleged to have known from the beginning that this project was infeasible and would never service the debt on the bonds.

When reviewing the potential culpability of May Zima, it is important to remember that this was not a project which ran out of money before the project was constructed. The retirement center was built, but it did not rent quickly enough to service the early years of the bond indebtedness. Under these facts, the plaintiffs would have had a difficult, but by no means impossible, time proving that the accountants acted with scienter, an element of the Rule 10b–5 cause of action asserted by the plaintiffs.

Since the plaintiffs have now recovered approximately $11 million out of the $16 million principal amount of the bond issue, the conclusion is inescapable that the settling defendants have paid their fair share of the damages in relation to their potential culpability.[5]

### 4. Participation of a Judge or Magistrate Judge in the Settlement Negotiations

This factor also weighs in favor of approving the settlements. Although a mag-

---

**5.** It is important to note here that none of the settling defendants has admitted liability, nor have the plaintiffs at this stage of the proceedings proven, or attempted to prove, such liability. Any settlement may therefore contain a discount of the damages to reflect the plaintiffs' risk that nothing would be recovered if the case were to proceed to summary judgment motions or trial.

istrate judge's supervision is not mandatory in order to determine a settlement is fair, such participation can insure that the parties will negotiate in good faith without collusion. In this case, the court appointed Magistrate Judge Cato to oversee settlement negotiations. Magistrate Judge Cato's participation kept the parties on the proper path.

In light of all of the foregoing factors, it is evident that the settling defendants in all partial settlements presented to the court in this case have paid their "fair share" of the potential damages to the plaintiff class such that the settlements are fair to the non-settling defendants. Accordingly, this court hereby approved the partial settlements and will enter the requested Bar Order.

IT IS SO ORDERED.