Sylvester J. VAUGHNS, Jr.,
et al., Plaintiffs,

v.

BOARD OF EDUCATION OF PRINCE
GEORGE'S COUNTY, et al.,
Defendants.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF PRINCE
GEORGE'S COUNTY, et al.,
Defendants.

Nos. CIV. PJM 72–325,
CIV. PJM 81–2597.

United States District Court,
D. Maryland.

Aug. 31, 1998.

Patricia A. Brannon, Washington, DC, for Plaintiffs.

Andrew W. Nussbaum, Upper Marlboro, Sean D. Wallace, Esquire, County Attorney's Office, Upper Marlboro, MD, for Defendants.

*OPINION*

MESSITTE, District Judge.

## I. Introduction

The parties to this long-standing litigation—the Prince George's County Branch of the NAACP and the Plaintiff class of African–American school children attending the public schools of Prince George's County ("Plaintiffs"), Defendant Board of Education of Prince George's County ("Board"), and Defendant George's County ("County")—have asked the Court to approve their Memorandum of Understanding ("MOU") in settlement of the litigation. The Court concludes that the MOU represents a fair and reasonable resolution of the issues that remain in the case and will approve it. More than that, the Court finds the agreement to be a fitting denouement to one of the most serious dramas of modern America.

## II. Procedural Background

In a series of opinions issued in 1972, Judge Frank A. Kaufman of this Court certified a Plaintiff class of "all black children residing in Prince George's County" and found the Board to be in violation of the school desegregation requirements of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). He ordered that certain student and faculty assignment measures be taken by the Board as correctives. *See Vaughns v. Board of Education of Prince George's County,* 355 F.Supp. 1034, 1035 (D.Md.1972); 355 F.Supp. 1051. In 1981, the Prince George's County Branch of the NAACP brought a separate lawsuit seeking relief substantially similar to that sought in the original litigation and moved that its suit be consolidated with the original litigation. At the same time, the original Class Plaintiffs filed a motion to reactivate their case. Judge Kaufman granted those motions.[1] In 1983 Judge Kaufman ruled on various issues raised by Plaintiffs, concluding that further relief in the area of student

---

1. Although the class has always consisted of African–American school children, the original Class Plaintiffs were in fact parents of such children, acting on behalf of their children and others similarly situated. Upon its entry into the litigation, the NAACP was also designated as Class Plaintiff for all purposes. *Vaughns v. Board of* *Education of Prince George's County,* 574 F.Supp. 1280, 1286 (D.Md.1983). Since then, all parents of African–American children actually in the County school system have been recognized as acting on behalf of their children, the actual class members.

assignment was likely to be warranted. See *Vaughns v. Board of Education of Prince George's County*, 574 F.Supp. 1280 (D.Md. 1983), *aff'd in part, rev'd in part and remanded*, 758 F.2d 983 (4th Cir.1985). In time, however, Plaintiffs and the Board resolved the contested issues by entering into a Memorandum of Understanding ("the 1985 MOU") that created a magnet school program, required certain educational enhancements at schools that remained racially isolated, and provided other relief. The 1985 MOU did not address the issue of when and through what process the Board might achieve unitary status and dismissal of the litigation.

The latest phase of the proceedings began on July 1, 1996, when Plaintiffs filed a Motion for Scheduling Order in response to media reports that for the upcoming school year the Board intended to admit students to magnet schools outside the racial admissions guidelines governing such admissions under the Court's orders. This Court addressed that issue in *Vaughns v. Board of Education of Prince George's County*, 941 F.Supp. 579 (D.Md.1996). At the same time, the Court directed the parties to begin a process that would address the longer-term issues of how and when the Court might consider the matter of unitary status under the Supreme Court's decisions in *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) and *Freeman v. Pitts*, 503 U.S. 467, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). The Court granted the County's motion to intervene as a defendant in the proceedings on August 14, 1996.

In an effort to establish as neutral and informed a data base as possible and after receiving recommendations from the parties,

the Court appointed a panel of independent education experts to study multiple factors within the County school system bearing on the issue of desegregation, including among other things student assignments, faculty hiring/assignments, transportation and quality of education being offered to white and black populations.[2] The panel was composed of Dr. Robert S. Peterkin, Dr. Christine Rossell, Dr. William T. Trent, and Dr. Robert E. Shoenberg (chair).[3] The panel undertook a comprehensive review of the indicated factors, analyzing extensive data, visiting more than 50 schools, and interviewing school staff and community members.

Following the issuance of a draft report by the panel, the parties were permitted to offer suggestions and criticisms of the draft that might be helpful in the preparation of the panel's final report. Once the final report of the panel issued, each member of the panel was made available for deposition by the counsel for the parties. Copies of the final report were distributed to locations throughout the County, including public libraries and the Offices of the Board of Education. Metropolitan and local newspapers also received copies.[4]

The parties simultaneously proceeded to develop their own cases relative to the motions that had been filed as well as to discover the cases of other parties to the litigation.

Following an appropriate period of discovery, the Court set the matter down for an evidentiary hearing.

The issues in the case were framed by three motions filed by the parties:

1) The Motion of the Prince George's County Board of Education for Partial Uni-

---

2. A copy of the Court's Order framing the issues for study is set forth as Appendix *A* to this Opinion.

3. As of the time of his appointment to the panel, Dr. Peterkin was Director of the Urban Superintendents Program and Francis Keppel Senior Lecturer on Educational Policy and Administration at the Harvard Graduate School of Education.

Dr. Rossell was Chairperson and Professor in the Political Science Department of Boston University.

Dr. Trent was Associate Chancellor of the University of Illinois at Urbana–Champaigne and Professor in its College of Education.

Dr. Shoenberg was an education consultant, formerly Dean for Undergraduate Studies at the University of Maryland (College Park) and past President and Member of the Board of Education of Montgomery County, Maryland.

4. A copy of the Executive Summary of the Report is set forth as Appendix *B* to this Opinion.

tary Status and To Modify Existing Court Orders;

2) The Motion of Prince George's County for Declaration of Unitary Status, Dissolution of All Injunctions and Dismissal of Action; and

3) The Motion of the Plaintiffs Vaughns class and NAACP Branch of Prince George's County for Continuation and Refinement of Remedy.

From November 18 through December 19, 1997 the Court held an evidentiary hearing on the issues raised by the three motions. The Court heard the testimony of the four members of the expert panel as well as testimony of expert and fact witnesses called by the parties. Considerable documentary evidence was introduced. At the close of the hearing, the Court listened to extensive argument by counsel. The Court had before it then, as it does now, a very clear view of the areas of dispute, both as to fact and law, among the parties.

During closing argument, in response to the Court's inquiry, the parties advised that resolution of at least some of the issues between them might be possible. The Court urged the parties, to the maximum extent possible, to attempt a settlement of the pending issues. In the meantime, for a reasonable period, the Court agreed to hold its decision on the pending motions *sub judice*. With a gentle push from the Court,[5] the parties, through counsel and their principals, met to develop a framework for resolving the litigation and ultimately to establish a written document, now titled the Memorandum of Understanding ("MOU"). A second more extensive document, the Accountability–Based Comprehensive Plan for the Prince George's County Public Schools in Support of the Memorandum of Understanding ("Comprehensive Plan"), was also developed as part of the implementation plan for the MOU.

These documents were submitted to and tentatively approved by the Court. A fairness hearing was set and notice of the hearing published. On August 25, 1998, the fairness hearing was held at which some 20 oral or written statements were received, including statements from elected officials, organizations, and individuals (three of whom were candidates for the Prince George's County School Board).[6] Approximately half the speakers took positions favorable to the proposed settlement, half took positions against it.

The parties now, by joint request, ask the Court to approve the MOU in settlement of their differences, an agreement which they believe is a "blueprint" for ultimate resolution and dismissal of the case.[7]

### III. Findings of Fact

A. The Memorandum of Understanding

The MOU provides for maintaining Court supervision over the case, but in an inactive docket status during implementation of the MOU and Comprehensive Plan unless Court involvement is required by the motion of a party to enforce the MOU or Comprehensive Plan. The parties recognize and acknowledge, as stated in the MOU, that "their resources and efforts are better spent in developing the comprehensive plan contemplated in this Memorandum of Understanding than in litigating further the unitary status or remedy issues." MOU at 18.

In developing the MOU, the parties had the benefit of the report filed with the Court by the Court-appointed expert panel as well

---

5. At an early stage of the negotiations, the Court deemed it appropriate to appoint a mediator to assist in promoting discussion among the parties. The mediator was Lawrence A. Shulman, Esquire, a private attorney and former President of the Maryland State Board of Education. The Court wishes to acknowledge the extraordinary role Mr. Shulman played in helping to bring the settlement agreement about.

6. The parents of only two actual members of the Plaintiff class made oral or written submissions in response to the Notice of Hearing. The two supported the proposed settlement in some respects, opposed it in others.

7. Copies of the MOU and Comprehensive Plan will be attached to the order filed in the official docket of these proceedings. Because of their bulk and because they have already been widely distributed, copies of the documents will not be attached to copies of the order circulated to the parties, their counsel, or the general public. However, as will be seen, this Opinion summarizes the principal contents of the documents.

as information generated through discovery and litigation. In addition, the parties were aware of the School Accountability Funding For Excellence Act (Ch. 565, 1998 Laws of Maryland) passed by the General Assembly of Maryland during the post-trial settlement discussions and incorporated the requirements of that Act into the MOU.

As acknowledged in the MOU, while the parties may not agree on all issues presented at this stage of the litigation, they do agree that cooperation in establishing educationally effective next-generation programs to promote and support diversity and equity in the Prince George's County Public School System would be more productive than further potentially divisive litigation.

The MOU, summarized below, is intended to focus available resources on improving student achievement, particularly achievement by African–American students, while concurrently maintaining school environments as racially diverse as possible. The MOU provides the framework for the Board's Comprehensive Plan, which also is described below. The MOU calls for specific steps to be taken, in accordance with guidelines established by the Maryland State Department of Education, in the following areas: maintenance of magnet schools, provision of compensatory support for racially non-diverse schools, phasing out of mandatory student assignments, accountability for student progress as reflected by academic indicators, increased support for all remaining schools in the District, financial support for the Comprehensive Plan, development of the Comprehensive Plan, removal of this litigation from the active docket, and eventual declaration of unitary status.

Section I of the MOU provides for the continuation of magnet schools, with expansion, change, and/or discontinuation of magnet programs on the basis of evaluations to be conducted by the Board. The Board has initiated a planning process in an effort to strengthen and refine magnet programs and recruitment. That section also provides that goals related to racial composition of magnet schools will be established and maintained up to a date in the recruiting process, but that should the goals not be met for any given school or program in any given year, available seats will be filled after the agreed-upon date without regard to race.

Section II provides for enhanced educational programs at schools that are racially isolated. Those programs will be consistent with the Maryland School Accountability Funding For Excellence Act. The MOU identifies the following desegregation-based compensatory support resources and programs which will be provided in racially isolated schools as defined in the MOU: full day kindergarten; a 20:1 student-to-teacher ratio, including math and reading resource teachers; a full-time guidance counselor; a media specialist; computer labs; summer school remedial instruction; quality field trips in addition to those which are available at all elementary programs; before and after school tutoring in grades K through 6; and the Comer School Development Program. The Board also will develop and implement, in consultation with State education officials and the parties, measures to enhance the effectiveness of these supports.

Section III provides that currently existing mandatory student assignments under current Court Orders will be phased out and eliminated as construction of new schools and renovation of existing facilities are accomplished with funds provided by the State of Maryland and the County. The parties express a commitment to provide the opportunity for children in Prince George's County to receive their education in as desegregated and racially diverse a setting as is practicable while also recognizing that the mandatory assignment of students is no longer the primary means of desegregation in the public schools and that demographic changes have rendered some of those assignments no longer productive. The parties also recognize that some parents may object to their child attending a school which is less racially diverse as a result of the elimination of mandatory student assignments. The MOU provides that, under certain prescribed circumstances where practicable, parents will be given the opportunity for their children to attend a more racially diverse school.

Section IV provides for accountability for progress on academic indicators for African–American students as well as all students in the school system. In order to ensure accountability, the Board has agreed in the MOU to provide data to the public regarding student academic achievement and the improvement made in reducing the achievement gap between African–American and non-African-American students. A significant number of student academic achievement indicators, including those established by the State, will be used to measure this progress. The Board has also committed to evaluating its policies, practices, strategies and administrative procedures to ensure that these are not hindering satisfactory student achievement and has agreed to alter these as necessary. Additionally, the Board will engage in a comprehensive assessment program designed to determine the success and failure of various academic programs with the ultimate goal of improving student academic performance, reducing drop-out rates, and increasing graduation rates. In addition to providing accountability in academic indicators, the Board reiterates in Section IV its long-standing commitment to hire and promote African–Americans throughout the school system and to assign school-based personnel on a basis that enhances diversity. The section further expresses the Board's commitment to reduce the number of teachers holding provisional certificates within the school system and the implementation of teacher quality and developmental initiatives contained in the Excellence Act.

Section V provides that schools not receiving compensatory resources described in Section II will be given a higher level of support and resources than they may currently receive, as funding becomes available, in the form of student to staff ratios of 25:1, a full-time media specialist and counselor support, additional text books, library books and instructional materials.

Section VI of the MOU describes funding commitments by the State of Maryland and the County which are necessary to support the MOU and the Comprehensive Plan. The State has agreed to provide additional capital funding in the amount of $35 million each year for the next four years. In addition, the County has agreed to provide $32 million in each of these years for school construction and improvement. The State has also committed to providing the school system with additional funding for magnet school programs, racially non-diverse schools, programs for economically disadvantaged students and students with limited English proficiency, teacher training and improvement, and several other areas. The MOU was made contingent on appropriate State funding being provided so that the specific requirements of the MOU could be carried forward. The General Assembly recently agreed to provide this needed funding. The Court notes, however, that the MOU calls for this plan to be declared null and void if the necessary funding for the capital program evaporates. Section VI also contains provisions regarding the management of school construction in Prince George's County which were modified in the Comprehensive Plan developed subsequent to the MOU.

Section VII describes development of the Board's Comprehensive Plan, which was finalized subsequent to the MOU and approved by the parties and the State of Maryland as required in the MOU. The Comprehensive Plan has also been submitted to the Court by the parties.

Finally, in Section VII the parties agree to jointly ask the Court to remove this case from its active docket and place it on the inactive docket. Plaintiffs and the Board will withdraw their outstanding requests for relief and the Board will join Prince George's County in its Motion for Unitary Status. The parties agree that the Court should grant the Motion for Unitary Status at the end of fiscal year 2002 if no motions for relief are pending or have been ruled against the Defendants. The parties further agree that the only requests for relief they would present to the Court while the case is on the inactive docket would relate to an alleged breach of the MOU or of the Comprehensive Plan or of failure of the funding conditions in Section VI of the MOU.

With the Court's approval of the MOU, it would become binding on the parties and

would supersede the Memorandum of Understanding of 1985 and all previous Court Orders entered in this case.

## B. The Comprehensive Plan

The Comprehensive Plan was developed to provide as detailed an account as reasonably possible of actions to be taken by the Board to implement the MOU and specifically its goals of achieving excellence, equity and diversity in the school system. Included with the Plan is a detailed time line with information about the completion dates for activities described in the body of the Plan. Also accompanying the Plan are four attachments: The Maryland State Department of Education Guidelines for the Development of a School Improvement Plan (Attachment A); Examples of Research–Based Programs and Strategies (Attachment B); Goals Related to Racial Composition for Magnet Schools (Attachment C); and Preliminary Phased Reassignment Plans for the High, Middle and Elementary Schools (Attachment D). The following is a summary of the principal components of the Comprehensive Plan, which parallel the major sections of the MOU.

### 1. Ensuring Accountability for Academic Progress

#### a. *Planning for School Improvement*

Beginning with the 1998–99 school year, all District schools will be required to follow the Maryland State Department of Education (MSDE) Accountability–Based School Improvement Process, which requires planning, monitoring and reporting of improvement of student achievement at all schools in the District.

#### b. *Implementation, Monitoring and Assessment*

A Department of School Improvement and a Management Committee for School Improvement will be established by the Board. Additionally, a School Improvement Specialist will be assigned to each cluster of schools to provide assistance with development of school improvement plans and to help monitor progress. The Comprehensive Plan details many specific academic indicators that will be used to determine the success of the various school programs. Further, the Board is committed to identifying assessment instruments for use on a semi-annual basis to measure academic progress. The Board will analyze results of such assessments to help each school determine areas for improvement. As part of the school improvement plan development, each school will be obliged to undertake a comprehensive needs analysis designed to help each school identify specific instructional needs. In light of these needs, the Board will see to it that every school documents implementation of research-based programs. As part of its emphasis on accountability, the Board will make public data that reflects student academic achievement, student and school improvement, and particularly gaps in achievement between African–American and non-African-American students. The data will be reported for the entire school system, for each individual school, and for individual programs within schools, where appropriate. All data will be disaggregated by race.

#### c. *Reporting Results of Accountability Measures*

The Board will develop reports according to MSDE guidelines that will be prepared on a semi-annual basis. Copies of the reports will be provided to the MSDE and all parties to the Comprehensive Plan.

#### d. *Intervention for Schools Not Making Satisfactory Progress*

Schools that do not achieve satisfactory progress on benchmarks will be required to develop action/intervention plans. Additionally, schools that fall below State standards will be placed on "Alert Status."

#### e. *Process for Ongoing Evaluation of Programs and Procedures*

The Board has committed to develop, by November 1998, a process for evaluation of the school system's various academic programs. The evaluation process will involve the consideration of alternative programs and practices that could potentially prove more effective. A Procedures Evaluation Committee will be appointed to examine

these issues and to suggest procedures for modification or elimination of problematic practices and for strengthening and added support to be provided for successful programs. This committee will provide an annual report to the Superintendent and the Board.

### f. *Teacher Recruitment, Training and Retention*

The school system will focus on strategies for reducing the number of teachers holding provisional certificates in the District. In an effort to achieve this reduction the District will perform a yearly needs analysis of newly hired teachers with respect to their certification status. This information will be used to inform teachers of state requirements and to encourage them to take advantage of District programs designed to help them achieve full certification. Additionally, reports on the status of the progress made in reducing the number of provisionally certified teachers will be provided on an annual basis to the Superintendent and the Board. During the 1998–99 school year, the PGCPS also will develop a master teacher program designed to aid new or non-tenured teachers in developing their teaching skills.

### g. *Commitment to Diversity in the Workforce*

The Comprehensive Plan reiterates the Board's commitment to enhancing diversity in teaching and administrative staff through continuing efforts to recruit, hire and promote African–Americans.

### 2. Maintaining Magnet Schools in Prince George's County Public Schools

### a. *Student Placement Procedures*

In the MOU, the parties commit to continue using magnet school programs as a means to create racially diverse learning environments and to provide beneficial educational opportunities for students. To this end, goals related to racial composition will be established and maintained up to a specific date, after which any remaining available seats will be filled without regard to race. All students who reside in the attendance area of a magnet school and meet all other eligibility requirements may attend that school without applying. All other interested students must apply through the lottery. Applications and brochures regarding the process will be mailed to all Prince George's County residents and will be widely available. Magnet fairs will also be held to inform families about the various available programs. Targeted recruitment procedures will be used for under represented student populations in each magnet program. At the same time, alternative magnet program placements will be offered to students on waiting lists for programs without vacancies. The Comprehensive Plan lays out in further detail the magnet placement activities the District intends to conduct.

### b. *Magnet Recruitment Procedures*

The Board has committed to evaluating and updating its magnet recruitment plan on an annual basis in order to "ensure that all interested students have the opportunity to apply for enrollment in magnet schools." Comprehensive Plan at 13. In 1997–98, new recruitment strategies included outreach to the non-English speaking community. Future planned enhancements include the establishment of a magnet "hotline" available to answer questions and the use of telephone banks for making calls to the community about magnets. Additionally, a Recruitment Center is being established to support magnet program recruitment efforts. A detailed calendar of magnet recruitment events accompanies the Comprehensive Plan.

### c. *Evaluation of Magnet Programs*

The Board has committed to ensuring that magnet programs are of high quality and attractive to students. To this end, the Board will regularly evaluate magnet programs with the goal of reproducing programs that work well and improving or eliminating those that are not successful. As new schools are established, the Board will consider the use of magnet programs to promote racial diversity. Plaintiffs, the County, and the community will be guaranteed meaningful opportunities to provide input into these decisions. Additional evaluations will be un-

dertaken of each magnet program with the goal of helping to create a racially diverse learning environment while at the same time providing high quality educational opportunities. These evaluations will be conducted every year and will begin in September 1998.

#### d. *Task Force to Study Magnet Program Issues*

In August 1998, a task force will be formed to study all data related to the magnet programs and to report their findings and recommendations to the Superintendent and the Board for improvement, replication or elimination of magnet programs.

#### e. *Support for Magnet School Office*

Additional financial and staffing resources will be provided to the Office of the Magnet Programs to ensure greater support and accountability for the system-wide magnet programs in the years ahead. The precise nature and extent of these resources will be defined by the Board during the 1998–99 school year.

#### f. *Magnet Schools and School Improvement Planning*

All magnet schools will adhere to the same requirements as non-magnet schools regarding the development of school improvement plans required by the State.

3. Providing Compensatory Support for Schools with Racially Non–Diverse Student Populations

As stated in the MOU, schools with racially non-diverse student bodies will be provided with additional desegregation-based, compensatory support. In addition to having the benefit of the previously described resources as required in the MOU, the schools will develop and implement research-based educational interventions. By September 30, 1998, the Board will establish a process for consulting with MSDE and the parties to this litigation regarding the selection of such programs. School improvement plans will evaluate the effectiveness of these additional educational interventions, particularly for their success in securing improved results for African–American and all other students. An

evaluation process will be developed by the Office of Research, Evaluation and Accountability to determine the effectiveness of the programs implemented in racially non-diverse schools in securing improved results for African–American and all other students.

With respect to racially non-diverse schools not currently receiving the full measure of additional resources received by other such schools, the Comprehensive Plan includes specific provisions concerning the Board's commitment to provide such resources. The Board is committed to providing such resources in all non-magnet schools. In regard to magnet elementary schools, the Comprehensive Plan commits the Board to provide such resources (consistent with fiscal constraints acknowledged in the MOU, as well as other planning considerations) no later than the third year of the MOU period if such schools remain racially non-diverse despite efforts to enhance racial diversity through recruitment or other means. Magnet programs in secondary schools are not required to be provided the compensatory resources identified in Section II of the MOU.

4. Increasing Support for Remaining Schools in the School System

The Plan reaffirms commitments contained in the MOU, i.e. to provide, as funding becomes available, support for additional resources at schools not currently receiving compensatory resources described above.

5. Phase Out Mandatory Student Assignments Under Current Court Orders

In implementing the MOU, the Board commits to returning students to community schools in a phased and orderly program spread over several years. Reassignments will be largely a function of the availability of space and will parallel new construction and the expansion and renovation of existing facilities. Every effort will be made to limit disruption that students may experience. While the Board stands committed to providing educational opportunities in as desegregated and racially diverse a setting as is practicable, it recognizes that schools will

mirror the racial makeup of the communities they serve. The Board will, to the extent practicable, promote diversity in its realignment of school boundaries. The process of redrawing school boundaries will be open to input and dialogue from Plaintiffs, the County, the Community Advisory Council and the community at large.

When establishing school boundaries, the District will consider racial diversity, strive to avoid racial isolation, and establish procedures for accomplishing these objectives. Students will be allowed to remain at their current school until they move to the next level and may be granted transfers under certain conditions stated in the MOU. Generally speaking, a transfer will be granted if, at the time boundaries are realigned, a student's newly assigned school is less racially diverse than his or her previous school.

A comprehensive, but tentative, reassignment plan is attached to the Comprehensive Plan as Attachment D. All reassignments will be made by the Board after public hearings and will be determined as construction of new schools proceeds. Plaintiffs, the County and the public will be provided ample opportunity to provide written or oral input as to proposed boundary alterations. Specifically, the Board and the County have committed to identifying, this fall, options to relieve overcrowding at Kettering Middle School, which options will be considered in public hearings to take place no later than February 1999.

6. Providing Additional Support for the Comprehensive Plan

The Board will be responsible for the management and supervision of the construction of new schools and additions to existing facilities, subject to certain conditions. The County will work closely with the Board and will appoint a project management team to review and monitor the school construction projects. Detailed descriptions of the management relationships between the County and the Board regarding capital projects are part of the Comprehensive Plan and include a Board commitment to contribute to the cost of these capital projects under certain conditions. The parties envision that at least thirteen new schools will be built in the next

eight years with the funding committed by the State and County. A detailed listing of each school and its projected date of completion is included in the Plan.

7. Conducting Performance Audit and Establishing Oversight Panel

The school system was recently the subject of a Performance Audit. The Oversight Panel will review the audit findings and monitor the implementation of audit-based recommendations.

## IV. Conclusions of Law

A. The law strongly favors settlements in school desegregation cases. *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 921 F.2d 1371, 1383 (8th Cir.1990). The public interest is served when the parties formulate lasting solutions to divisive litigation through mutual cooperation. There can be little doubt that "a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming." *Id.* 921 F.2d at 1383. *Accord United States v. City of Jackson*, 519 F.2d 1147, 1152 (5th Cir. 1975). Indeed, "'[a] strong public policy favors agreements, and courts should approach them with a presumption in their favor." *Little Rock Sch. Dist.*, 921 F.2d at 1388. *Accord United States v. Texas Education Agency*, 679 F.2d 1104, 1108 (5th Cir.1982); *Armstrong v. Board of School Directors of Milwaukee*, 616 F.2d 305, 321 (7th Cir.1980). (*Armstrong* recently was overruled on the different issue of the non-appealability of class action judgments by non-parties. *See Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).)

B. The role of a court in reviewing the proposed settlement of a class action under Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and comport with due process and to examine the settlement for fairness and adequacy.

As to the question of notice to class members, proof of notice of the settlement and fairness hearing by publication as ordered by the Court has been filed by counsel for the Plaintiff class. That filing discloses

publicity concerning the settlement and fairness hearing in the press not only in Prince George's County but in the greater Washington, D.C. metropolitan area as well. The Court takes judicial notice of that publicity. The Court has received written comments from members of the class and other interested persons in accordance with the published notice. The Court finds that the notice requirements of Fed.R.Civ.P. 23(e) have been met.

■ In accordance with the law of the Fourth Circuit, the Court applies certain factors to determine whether a proposed class action settlement is fair and adequate. First, to determine whether the settlement was reached "as a result of good-faith bargaining at arm's length, without collusion," the Court must weigh "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the [relevant field of] class action litigation." *In re Jiffy Lube Securities Litigation,* 927 F.2d 155, 159 (4th Cir.1991); *accord South Carolina Nat. Bank v. Stone,* 139 F.R.D. 335, 339 (D.S.C.1991).

■ In this case, the proposed settlement was reached at a very advanced stage of litigation, a factor which militates strongly in favor of the settlement. *Cf. Jiffy Lube,* 927 F.2d at 159 ("We have held that a reasonable judgment on the possible merits of the case is best achieved when all discovery has been completed and the case is ready for trial"). Not only is this litigation more than two decades old, but on the immediate issues the parties completed discovery, had the benefit of the report by the Court's experts, and actually tried their case to the Court. Each has seen all the cards the others had to play. While each party still faced the litigation risk of not knowing how the Court might rule, the parties had an unusually full opportunity to assess that risk by seeing all the evidence the Court would weigh in arriving at its decision.

The Court's observation of the parties' efforts in discovery and at trial confirms that this has been a hard-fought engagement without the least breath of collusion involved in the settlement. Each party was willing to go the full distance, each expended considerable effort and resources along the way. Settlement negotiations were protracted and much of the time were, as earlier noted by the Court, supervised by a Court-appointed mediator, Lawrence A. Shulman, Esq. Discussions were detailed and adversarial. The Court also is aware that counsel for the Plaintiffs have extensive experience in school desegregation litigation, principally class actions. Counsel for the Plaintiff class recommend the settlement. The Court concludes that the proposed settlement is non-collusive and was reached in good faith.

■ The Court must next consider the relative strength of the parties' cases and the uncertainties of litigation on the merits. *See South Carolina Nat. Bank,* 139 F.R.D. at 339–40. While the Court is not supposed to resolve disputed issues of law or fact in weighing this factor, *see Reed v. Rhodes,* 869 F.Supp. 1274, 1279 (N.D.Ohio 1994), it is clear that sharp differences of viewpoint were expressed by witnesses at the hearing as to whether vestiges of segregation still affect various areas of operation of the Prince George's County Public Schools. While Plaintiffs advocated vigorously that such vestiges remain, the County offered extensive evidence that there were no such vestiges and the Board presented numerous witnesses espousing the view that the only vestiges remaining are in the area of quality of education. Counsel have advised the Court that, at the end of the trial, each party emerged fully believing that its view of the case had prevailed. The Court has no doubt that the parties entertain that view today. On the merits, therefore, no party could be certain of the outcome.

■ The next factor the Court must consider is the complexity, expense, and likely duration of additional litigation. *South Carolina Nat. Bank,* 139 F.R.D. at 340. While the issues developed in this phase of the litigation were ripe for a Court ruling when the parties reached the proposed settlement, further litigation was still inevitable. If Plaintiffs prevailed in whole or in part, the litigation would continue on an indefinite course until Defendants might carry their

burden of showing their entitlement to unitary status. *See Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991). If Defendants prevailed, virtually certain appeals would result in further expense and delay.

A fourth factor in judging the reasonableness of a class action settlement—the solvency of defendants and the likelihood of recovery—has limited bearing in a case where money damages are not involved. It is particularly noteworthy, however, that the settlement provides for substantial funding for school construction by the State of Maryland, relief not otherwise available through this litigation.

Finally, a very limited degree of opposition to the settlement has been voiced by class members. The class now consists of over 90,000 students. While a handful of written and oral comments on the proposed settlement have been submitted to the Court, few if any were filed on behalf of current class members. Overall, the comments range from criticism of any settlement at all (including requests for an immediate end to busing of students) to guarded approval of the settlement with reservations as to certain specifics (including concern over insufficient attention to comprehensive schools and less than rigorous academic indicators). Such comments may well commend themselves to the parties for further consideration as the MOU and Comprehensive Plan go forward. But the Court finds no significant or consistent criticism of the settlement that warrants its disapproval.[8]

The settlement before the Court was clearly the product of compromise. The Court is well aware of the conflicting positions of the parties with regard to whether there still is a need for the Court's continuing involvement in the educational life of Prince George's County. The parties' disagreements have been strong and fully expressed. The settlement that they unanimously advocate sets goals for the future of the Prince George's County Public Schools—to preserve the ben-

efits of desegregation where practicable but to phase out mandatory student assignments, most of which no longer promote desegregation, as additional classroom space becomes available closer to students' homes. This is a fair and reasonable resolution for the members of the Plaintiff class. It will also, all things considered, serve the educational needs of Prince George's County as a whole as it enters the 21st century.

A separate Order will issue approving the proposed class action settlement and granting related relief.

## APPENDIX A

### *ORDER*

#### Oct. 10, 1996

Pursuant to its decision to conduct a comprehensive review of court-ordered school desegregation in Prince George's County, the Court by Order dated August 9, 1996, directed counsel to attempt to agree on issues that the Court-appointed panel of experts might address. Counsel have now submitted their respective proposals. The Court has reviewed these proposals and has met with counsel and discussed them. On that basis, the Court will charge the panel of experts to consider, as fully as possible, each of the following factors within the Prince George's County school system:

a) Student assignments

b) Faculty hiring/assignments

c) Staff hiring/assignments

d) Transportation

e) Extracurricular activities

f) Facilities

g) Quality of education being offered to white and black student populations

h) School board appointments

i) Compensation

j) Curriculum

k) School location

l) Comparative drop-out rates

m) Graduation rates

n) Scores on standardized tests

---

8. The Court finds particularly persuasive the comments on the proposed settlement that the court-appointed panel of experts submitted at the fairness hearing. The comments are set forth as Appendix *C* to this Opinion.

o) Such other factors as the Court may direct in the course of the panel's study.

\* \* \* \* \* \*

As to each factor listed above, the panel shall address the following questions:

1) Has there been full and satisfactory compliance with the Court's decrees?

a) What have the Court decrees required?

b) Has the Board complied with the decrees?

c) Has compliance been full and satisfactory?

d) What else, if anything, could the Board have reasonably done?

2) Is retention of judicial control necessary or practicable to achieve compliance with the decrees in any respect?

3) Has the School Board demonstrated a good faith commitment to the whole of the Court's decrees since they were entered?

4) Have the vestiges of past discrimination been eliminated to the extent practicable?

a) What vestiges of discrimination, if any, still remain?

b) What has been done?

c) What, practicably speaking, could still be done to eliminate any remaining vestiges?

The panel of experts shall develop appropriate evaluative data and a report on the specific issues identified by the Court during the school year 1996–97.

Defendant Board shall authorize an initial budget of up to $100,000 for the implementation of this order and in addition shall make available, on a full-time basis, if necessary, a staff person to function as executive secretary for the panel of experts. In such capacity, said individual shall be accountable to the panel and to the Court as opposed to the parties in these proceedings.

The Court will make the panel of experts available to the parties and their counsel so that the experts can learn first-hand of the issues that are of concern to the parties. A draft of the experts' report will be made available to counsel for the parties by no later than April 1, 1997. The parties will have 45 days thereafter in which to comment, provide the experts with additional information, and otherwise contribute to the experts'

final report, which will be filed with the Court by no later than July 1, 1997.

Discovery in these proceedings shall go forward with all dispatch. The Court contemplates that discovery will be open and freely available to and from all parties. In any event, discovery on such motions and on issues raised by the panel of experts shall be completed by no later than 60 days before trial. The parties will file pre-trial briefs no later than 30 days before trial.

Trial in this matter shall be set between October 15, 1997 and approximately December 31, 1997.

Consistent with the Court's Order of August 9, 1996, counsel shall consult with one another and attempt to agree on names of proposed experts qualified to examine the referenced issues and, agreeing or not, shall submit names and resumes of proposed panel members within seven (7) days hereof. The Court will undertake selection of the panel members as soon thereafter as possible.

IT IS SO ORDERED this __9__ day of October, 1996.

/s/ Peter J. Messitte

PETER J. MESSITTE

UNITED STATES DISTRICT JUDGE

APPENDIX B

**EXECUTIVE SUMMARY**

REPORT OF THE COURT–APPOINTED PANEL IN VAUGHNS ET AL V. PRINCE GEORGE'S COUNTY BOARD OF EDUCATION ET AL

Submitted to Judge Peter J. Messitte

June 30, 1997

I. *The Nature of the Report*

This panel was appointed pursuant to the Court's determination to "conduct a comprehensive review of court-ordered school desegregation in Prince George's County." In carrying out its role in this review, the Panel was ordered to address four major questions:

- Has there been full and satisfactory compliance with the Court's decrees?
- Is retention of judicial control necessary or practicable to achieve compliance with the decrees in any respect?

- Has the School Board demonstrated a good faith commitment to the whole of the Court's decrees since they were entered?

- Have the vestiges of past discrimination been eliminated to the extent practicable?

The Panel, then, is clearly directed to focus its attention on the extent to which the Prince George's County Public Schools have acted in good faith to eliminate vestiges of prior discrimination and have been successful in their efforts. The panel is not charged with evaluating the general educational effectiveness of the Prince George's County Public Schools (PGCPS).

Judge Messitte directed the panel to consider 14 specific issues:

    A.   student assignments

    B.   faculty hiring/assignments

    C.   staff hiring/assignments

    D.   transportation

    E.   extracurricular activities

    F.   facilities

    G.   quality of education being offered to black and white students

    H.   School Board appointments

    I.   compensation

    J.   curriculum

    K.   school location

    L.   comparative dropout rates

    M.   graduation rates

    N.   scores on standardized tests

The specific studies to be undertaken in exploring each of these issues was left to the Panel's discretion.

## II.   The Organization of This Report

The report is organized according to the structure of the charge to the Panel in the October 9, 1996 Court Order. The major portion is devoted to analysis of each of the 14 factors. The "Conclusion" is organized according to the four major questions the Panel was asked to address.

## III.   The Conduct of the Study

A large portion of the study consists of data analysis. All data were supplied by PGCPS. Since the data requested were extensive, often dispersed in various offices, unavailable in the configuration or format requested or simply unavailable, school system staff had to devote a great deal of time to meeting the Panel's requests. They provided extraordinary assistance and supportive cooperation.

The Panel also enjoyed the willing cooperation of dozens of system administrators and school-based personnel. Panel members visited 51 schools, talking and touring the building with the principal, other building administrators, teachers and occasionally parents and students. The members spent many hours in conversation with administrators holding system-wide responsibilities for specific school programs and support services, as well as with Superintendent Jerome Clark and Deputy Superintendents Louise Waynant and Robert Slade. Thus the conclusions are informed not only by statistics but also by extensive and direct contact with people and programs.

The Panel also met with the Board of Education, NAACP leadership and the Community Advisory Committee on Magnet and Compensatory Programs ("Committee of 100").

## IV.   Brief History of Vaughns v. Board of Education

This brief orientation to the Vaughns case is designed to illuminate the structure and emphases of the Panel's report.

*July 1972.* U.S. District Court Judge Frank Kaufman finds the Prince George's County Public Schools (PGCPS) to be segregated. Orders PGCPS to institute a program of school boundary changes and busing of students out of their "home" districts in such a way as to eliminate racial segregation and create racial balance in school enrollment. Establishes guidelines for the hiring of African–American faculty members to be reflective of the racial composition of the county and the even distribution of African–American faculty throughout the system.

*Fall 1981.* PGCPS discontinues a portion of the court-ordered busing. Plaintiffs move to reopen the case, broaden the range of alleged segregation-related issues beyond student assignment and faculty hiring and assignment issues. New issues include under-representation of African–Americans in the Talented and Gifted Program (TAG), overrepresentation of African–Americans in special education programs, disproportionately high numbers of African–American students suspended, and the creation of racially identifiable classrooms.

*June 1983.* Judge Kaufman finds no intent to discriminate in any of these matters or, where alleged, any vestiges of prior segregation in any of the matters pointed out by the plaintiffs. He does find that the Board's unilateral action to curtail some busing violates earlier court orders. He concludes that the system still is not unitary, citing cancellation of some of the court-ordered busing and continuing high percentages (greater than 80 percent) of African–American students in the same schools that had formerly been entirely African–American. On this basis the Court reenters the case.

*March 1985.* U.S. District Court of Appeals for the Fourth Circuit rules that
Judge Kaufman improperly placed on the plaintiffs the burden of proof for demonstrating discriminatory intent in African–American student over-representation in special education programs and under-representation in the TAG program. Upholds lower court decision in all other matters on which appeal was taken.

*June 11 1985.* On remand of the case from the Court of Appeals, Judge Kaufman finds that defendants have met the burden of proof with regard to both special education and TAG placement.

*June 21 1985.* Parties sign a Memorandum of Understanding (MOU), which in most respects governs the current situation. They agree to a proposed program of magnet schools designed to bring more Other Race students into schools with predominantly African–American populations. The Magnet School Program, in combination with continued busing for desegregation purposes is to bring most schools within a range of 10%–80% African–American enrollment, consistent with a maximum busing time of 35 minutes, until such time as the African–American student population should reach 65 percent.

Certain schools with very high percentages of African–American students, for which busing is not a practical solution to racial isolation ("Milliken II Schools"), are to be provided with specified additional resources and programs to compensate for their racial isolation. The goal is to have 85 percent of schools within the 10%–80% guideline. This guideline, applied separately to elementary, middle and high schools, is to remain in effect only until school system enrollment exceeds 65 percent African–American. No provision is made for what should happen once the system passed 65 percent African–American enrollment. MOU also includes the following agreements:

- PGCPS will continuously review the effects of the magnet programs to see if they are successful in achieving specified desegregative effects.

- Plaintiffs will not challenge the attendance areas for those schools outside the guidelines for African–American student population which are slated to receive extra resources.

- TAG magnet programs will have as a goal enrollments of 50 percent Black, 50 percent Other Race. The parties also agree that the resources brought to a school by the TAG magnet will be available to all other children in the school.

- PGCPS will perform a new study of busing and make recommendations to the plaintiffs and the Court about ways of eliminating unnecessary busing and reducing busing time and distance for African–American students.

- An agreed "back-up plan" based on this study will be implemented should the magnet programs fail to have their anticipated desegregative effects.

- PGCPS agrees to establish a citizen committee to advise the system on magnet and compensatory education programs and to monitor them.

*April 1991.* In response to a suit brought by teachers protesting PGCPS' denial of seniority rights in transfer requests, the Court rules that when *assigning* new teachers to schools, PGCPS should strive to bring the proportion of African–American teachers to within a range of +/−7 percentage points of the previous year's percentage of African–American teachers in the system. In cases of voluntary *transfer* of teachers between schools, negotiated seniority rights will apply unless the transfer would bring the teaching staff at either the sending or receiving school to more than 50 percent African–American or less than 12 percentage points below the percentage of African–American teachers in the system the preceding year.

*April 1996.* Plaintiffs return to Court in objection to a school system initiative to fill with African–American students unfilled spaces in magnet programs designated for White students. The Court permits the practice after due additional efforts to locate Other Race students willing to fill the places. Defendants ask that the long-standing desegregation court order be substantially narrowed in scope. The Prince George's County Government joins the school system, asking the Court to remove the order entirely and declare the school system unitary. Both parties and the Court ask this Court-appointed panel to examine the current status of desegregation in PGCPS in terms of the 14 factors listed above and in the context of the judicial history of the case.

## V. *Discussion of the Fourteen Factors*

Following is a summary of the major findings for each of the fourteen factors the Panel was asked to consider.

### A. Student Assignments

Analysis here focuses on the desegregation results both by school and by classroom. This analysis of enrollment trends is conducted against a background of changes in the racial composition of the student body, in desegregation standards, and in strategies designed to further desegregation.

The 1983 Court order specified that the 80 percent upper limit guideline for African–American student enrollment in a school would hold only until African–American enrollment reached 65 percent. With no guidance beyond that point, PGCPS developed its own guideline for raising the upper limit proportionately to the growth in African–American enrollment. If the upper limit was 80 percent when system enrollment of African–Americans was 65 percent, a ratio of 1.23:1, then as African–American enrollment grew beyond that point at each school level, the upper limit would be 1.23 times the current African–American enrollment.

Rapidly increasing African–American enrollment has made it difficult to stay within this guideline. The system came closest in 1985 with 76 percent of elementary students, 85 percent of middle and 87 percent of high school students at schools within the 10–80 percent range. For the current school year the comparable figures are 70.2 percent for elementary schools, 92.5 for middle schools and 80.5 percent for high schools within the expanded guidelines, which are different for each level.

Two desegregation indices reflect the changing demographics. The "Index of Interracial Exposure" reflects the number of Other Race students in the average African–American child's school. This index shows a huge improvement with integration in 1973, followed by steady erosion as the percentage of Other Race students—and thus the maximum possible interracial exposure—declines. The curves of the maximum and the actual exposure follow each other closely, with some increasing separation between the actual and the possible in the early 1980's and a slight narrowing trend since then. Since the narrowing is coincident with the beginning of the magnet school program, it is possible to infer a causal relationship. This inference is supported by a continuing close approximation of actual interracial exposure in magnet programs to the possible maximum, suggesting that the magnet schools have kept interracial exposure within the school district as a whole as close to the maximum as it is.

The "Index of Dissimilarity" tracks the evenness with which students of different races are distributed across the system. This index shows a slight decline in racial imbalance with the institution of the magnet school program but then continues what has otherwise been an unbroken gradual worsening since 1974. Most of the change, however, took place before 1985. The changes have in recent years been within a narrow range.

Milliken II Schools, a designation used in Prince George's County as throughout the country, are predominantly African–American, racially imbalanced schools that receive additional programs and resources to compensate for their racial isolation. The percentage of total PGCPS enrollment in Milliken II Schools has increased from 6 in 1985 to 13 in 1996.

PGCPS' extensive program of busing for purposes of desegregation, along with Magnet Schools Program designed to encourage voluntary transfer of students to schools where their racial group is underrepresented, had some immediate successes in improving racial balance to target levels but were unable to sustain the improvements. The major factor in this pattern has been the increasing percentage of African–American students in the system. Not only have the actual percentages increased but the *rate of change* has shown a steady upward progression. The consequent decline in the indicators of desegregation are visible for the system as a whole and for every sub-group within the system except the comprehensive schools.

### 2. *Desegregation in Classrooms*

The "Standardized Racial Exposure Index" reflects the degree to which the percent of Other Race students in each class deviates from their percentage representation in the individual school population as a whole. This index is similar to the "Index of Dissimilarity" used in representing the level of desegregation in the school system as a whole. With regard to this measure, PGCPS shows, in the panel's experience, a high level of classroom integration.

Prince George's County has virtually no classrooms with no African–American students. No such classrooms are to be found in elementary schools and only 0.3 percent in middle and high schools.

### 3. *Desegregation in Special Programs*

Lack of clarity in the 1985 Memorandum of Understanding about the long-term intent of the guidelines for TAG magnets and the MOU's silence on expectations for the TAG program as a whole create difficulty in determining conformity to Court decrees. Today in the school system as a whole, students enrolled in TAG programs are 51 percent African–American and 49 percent Other Race. In the TAG magnets the average program is 57.8 percent African–American.

The school system's effort at inclusiveness in TAG programs may be understood by looking at the ways, called "paths," in which students get identified as "talented and gifted."

Path 1 is the traditional identification mode of test scores supported by teacher recommendation. Path 2 is used for students whose scores on the TAG Assessment Matrix are close to qualifying on the basis of test scores and have one or more of the following characteristics: English as a second language, low socioeconomic status, one or more years above grade level in reading and math, or a learning disability and high ability test scores. Students thus identified are included in TAG programs on a trial basis.

Path 3, also known as Project STEP, is directed specifically at "minority" students, minority identified not only in terms of race but those with language, cultural, economic or educational disadvantages. Teachers are trained in the use of criteria and observational data that will help them identify potentially talented and gifted students by means other than test scores.

Path 2, special identification on a trial basis, is the means of access for 64 percent of TAG students. Project Step, which is particularly directed at non-White students, adds another 11 percent. Thus the system appears to be trying hard to give all students who can benefit from TAG programs a chance to do so, working in many ways, with multiple

criteria, and ultimate decisions by committees which are racially balanced.

Since grade records are not kept centrally for elementary school students, the Panel had only middle and high school grade distributions in TAG courses to estimate how African–American students are graded once they are admitted to the program. They get disproportionately low percentages of the A's, about proportionate numbers of B's and disproportionately high numbers of the lower grades.

Advanced Placement courses are offered to students in the eleventh and twelfth grades. In 1996 African–Americans represented 51 percent of the enrollment in these courses at a time when 74.1 percent of high school students are African–American. This situation represents a proportionate improvement over a five year period from 42 percent African–American enrollment in these courses in 1992 when the high school population was 68.9 percent African–American.

The International Baccalaureate Program (IB), a two-year program of demanding high school courses overseen by an international body, is offered in four high schools and enrolls 1425 students, 65.6 percent African–American. Thus African–American students are enrolled in the IB program in numbers more nearly proportionate to their representation in high schools than they are in TAG programs.

With regard to special education, PGCPS is now operating under a 1996 "Partnership Agreement" with the U.S. Office for Civil Rights. The system has agreed to explore the reasons for the overrepresentation of African–Americans in the mental retardation, seriously emotionally disturbed, and specific learning disabilities categories and to develop strategies alternative to special education placement for helping some of these students.

## B. Faculty Hiring and Assignments

The applicable guidelines governing assignment of teachers by race have a complex history and are somewhat confusing. Readers unfamiliar with these guidelines are urged to consult the full text.

### 1. Teacher Hiring

PGCPS has done extremely well with the hiring of African–American teachers. At a time when the teaching staff has grown by 17.4 percent in the past five years (from 6168 to 7244), and when there is intense competition for comparatively small numbers of African–American teachers both nationally and within the Washington metropolitan area, PGCPS has increased the percentage of African–American teachers in the system from 31 percent in 1993 to 38 percent in the current school year. The result has been achieved by mounting an imaginative and aggressive recruitment campaign, which has generated a large pool of African–American applicants.

### 2. Teacher Assignment by Race

A benchmark range of +/−7 percentage points from the percentage of African–American teachers in the system applies to the assignment of new teachers. This range is unique to PGCPS.

The court-approved range going from a minimum of 12 percentage points below the African–American teacher percentage in the system to a maximum of 50 percent of the school's teaching staff applies to the transfer of teachers within the system. The system may override seniority rights and deny any transfer in cases where the transfers would have a negative effect on racial balance at schools outside the range or cause schools to fall outside of it. This range, currently 25–50%, is the more reasonable basis for measuring success, because it applies to the situation as it exists rather than to a guideline applicable only to new assignments. Slightly more than two thirds of the schools (70%) fall within this guideline. The percentage of schools within guidelines varies with grade level.

### 3. Teacher Assignments by Experience

The average amount of teacher experience in schools with higher percentages of African–American student enrollment is consistently less than that for schools with lower percentages. This pattern holds true for every level and for each of the past six years.

The difference in teaching staff experience at the elementary level between the highest and lowest percentage African–American schools has decreased some since 1992 from 5.32 years to 3.9 years. Still, the highest percentage African–American schools, mostly Milliken II Schools, have substantially less experienced teaching staffs than the schools that are more than half Other Race.

### 4. Teacher Assignments by Level of Education

A study done by the Department of Research, Evaluation and Accountability shows that the average years of education for teachers in a school is a statistically significant factor in their students' performance on MSPAP tests relative to expectations. Data on education levels for elementary grade teachers for the 1994–95 and 1995–96 school years shows that Other Race elementary school teachers average about the equivalent of one more university course (i.e., about 0.1 more years of post-baccalaureate training) than African–American teachers. While this difference is statistically significant, it does not seem like a large difference.

In terms of teacher training by school, there is a somewhat larger difference between schools with higher and lower percentages of African–American students, amounting to the equivalent of 2–3 university courses.

### 5. Teacher Assignments to Advanced Placement (AP) Courses

The 20 high schools in Prince George's County offer a total of 157 sections of Advanced Placement courses. Of these, 24 sections or 15 percent of the total are offered by African–Americans, a substantial under-representation considering that 45.3 percent of the average high school's teaching staff is African–American.

### C. Staff Hiring

Over the past five years, the percentage of African–Americans has increased in every job category. Furthermore, with three single year exceptions, the percentage of African–Americans in each job category has increased or remained constant every year.

### D. Transportation

Busing students to achieve racial balance has been a core element of the remedy to segregation since the 1973 implementation of the 1972 decision in *Vaughns*. The Magnet Schools Program was intended as an alternative to further involuntary reassignment.

In 1973, the burden of desegregation busing fell equally, as far as numbers were concerned, on African–American and Other Race students. Over the years, however, the percentage of African–American students enrolled in the school system increased, those students in 1996 accounting for 91.8 percent of those bused to achieve desegregation in a system 73 percent African–American. Such disproportionate busing burden on African–American students occurs when school districts try to meet racial balance requirements in a situation of declining White enrollment such as exists in Prince George's County.

Having been found culpable for changing the busing plan in 1980, PGCPS has made only minor changes within the guidelines to adjust for school openings and closings and has not gone back to the Court to get approval for an overhaul of the plan. The current busing plan, not including magnet busing, makes about a three percentage point contribution to desegregation.

The percentage of African–Americans bused to magnet schools is currently about 72 percent. This percentage is almost exactly proportionate to the student racial distribution.

### E. Extracurricular Activities

Cross-race contact outside the classroom is measured using the same kind of indexing employed in analyzing racial contact in schools and in individual classrooms. School-wide calculations for each of the secondary schools show that schools with the largest percentages of Other Race students have the highest percentage other in extracurricular activity participation. Within most schools, however, the pattern of desegregation varies widely from one type of activity to another. This kind of analysis is more useful in looking at activities within a school than at the school as a whole.

## F. Facilities

This factor has been interpreted broadly by the courts to include not only school buildings, but also other resources that support education. Thus, in addition to looking at physical facilities under this heading, individual school funding is also considered.

### 1. *Physical Facilities*

The possible issue here is the relative quality of school buildings and facilities within them that are available to students in schools with different racial/ethnic balance.

Analysis of capital spending in terms of location reveals no pattern that suggests differential treatment. Most of the few new schools have been built outside the Beltway and in the northern part of the county where the growth in population has occurred. Spending on renovations and systems has been about equally divided between north and south. Most of the renovations have been inside the Beltway where most older schools are located.

The system's schools, with rare exceptions, have State ratings of fair to good. The existence and condition of certain kinds of facilities within buildings does not seem to be related directly to racial/ethnic patterns but rather to the age of the buildings. Although the schools are older inside the Beltway and south of Central Avenue, they are not less well maintained. Schools in all geographically defined sectors are within .3 of a point of the average State-rated condition for the system as a whole.

The panel observed two instances in which paired schools north and south of Central Avenue had facilities in strikingly different condition: Eleanor Roosevelt High School and Oxon Hill High School; Tall Oaks and Croom vocational schools.

### 2. *Instructional Expenditures*

Total expenditures per student, including state and federal as well as locally generated funds, are on average fairly equitably distributed between schools with African–American enrollment below the system average and those above. Magnet schools with a higher Other Race student body receive an average $44 or 1 percent less per pupil than those with higher African–American populations. Among comprehensive schools, the differential is somewhat larger, $389 per pupil or 10.5 percent. Funding for the model comprehensives is identical to that for the higher percentage African–American schools. Milliken schools, as expected, get the highest per pupil funding.

Looking only at funds from county sources, per pupil expenditures are greater at schools with higher African–American enrollment, except for magnet schools where the opposite is true. Model comprehensives and other comprehensives with greater African–American enrollment receive much the highest per pupil support from county funds, much more than Milliken schools whose differential funding comes from state and federal sources.

## G. Quality of Education Being Offered to Black and White Student Populations

Issues related to magnet and Milliken II schools are considered under this heading.

### 1. *The Magnet School Program*

Beginning in 1985, PGCPS established and maintained an unusually large and diverse set of magnet programs which have had a significant, consistently positive effect on desegregation. Since 1987–88, the first year of large scale magnet operations, enrollment has grown from 11,745 to 27,403. 23 percent of all African–American students are enrolled in magnet programs and 20.3 percent of all Other Race students. In the current year African–American students constitute 75.7 percent of the magnet program enrollments and 73.3 percent of the total school enrollment.

The great majority of the magnets, 75 percent, have been placed in schools that in 1984, the year before the Magnet School Program was initiated, had more than 50 percent African–American student enrollment. This choice is appropriate, since the intention is to draw other race students to schools with a high percentage of African–American students. Thus about 60 percent of the programs are south of Central Avenue and 58 percent are inside the Beltway.

Eighty-seven percent are located in either one or both sectors.

All magnet programs, to at least a small degree, positively affect racial balance.

- Magnet programs *reduced* the percentage of African–American enrollment in schools with an attendance zone *greater* than 70 percent African–American and *increased* African–American enrollment in schools *less* than 70 percent African–American.
- The "program-within-a-school" structure (e.g., TAG magnets) has greater desegregative effect than the "whole school attendance zone structure" (e.g., Traditional/Classical Academy) for schools whose enrollment without the magnet is greater than 70 percent African–American. The whole school attendance zone structure has the greater impact in schools whose attendance area enrollment is less than 70 percent African–American students.
- Having a "mirror" magnet in a school with less than 50 percent African–American enrollment positively affects the attendance of Other Race students in the magnet it "mirrors." The mirror magnets have been quite conscientious about restricting enrollment from outside their attendance areas to African–American students.

The Panel noted several issues affecting the Magnet Schools Program that should be considered.

a. **Program Purpose.** Magnets were created as an instrument of desegregation by offering parents and students choice of educational opportunities. However, the *choice* aspect has become dominant in the eyes of parents and the public, even as the school system tries hard to maintain the primacy of the *desegregation* purpose.

b. **Variety of Magnet Programs.** The current mix of magnet programs has not been reviewed for quite some years to see if the existing array of programs best meets student needs, if some models need revamping, and if some additional models might be developed.

c. **Evaluation.** PGCPS has begun a comprehensive formative evaluation of each major type of magnet program, asking various stakeholders (teachers, parents, staff, students) how well they perceive the different kinds of magnet programs to be employing the educational strategies and supporting the program structures that define their special nature. However, clear educational goals for most types of programs have not been established and no systematically gathered information is available about how students progress and perform as a result of their participation in PGCPS magnet programs.

d. **Accountability.** Accountability for the success of the Magnet Schools Program is divided between two parts of the school system administration. The Magnet Program Coordinator is responsible for administering the mechanics of the countywide program and ascertaining that the schools are implementing their magnet programs as they were designed and intended. Day-to-day management and supervision of the programs lies with magnet program coordinators who are accountable to their school principals who are in turn accountable to the Chief Educational Administrators (CEAs) of each of the 20 school clusters. The CEAs are responsible to the Deputy Superintendents. This structure seems problematic in that those administrators who are focused on magnet programs and have expertise in their curricula and management (i.e., the Magnet Program Director and the magnet coordinators) do not have authority to direct their functioning, while those who have the authority (i.e., the principals and CEAs) are accountable for magnet program functioning only as one concern among many.

2. *Milliken II Schools*

Eighteen elementary schools, three middle schools (or some grades within the school) and two high schools have been designated as Milliken II Schools because of their high percentage of African–American students (over 90 percent) and receive enriched programming and funding. These additional resources have been committed as promised.

Disparities between the 18 Milliken elementary schools and the 18 elementary

schools with the lowest African–American student enrollment are noted in two areas:

- Teachers in Milliken schools average 30 credits beyond the baccalaureate degree. Teachers in the comparison schools average about 15 percent more training.
- For the current school year, the 18 Milliken Schools average 9.17 years of experience per teacher. The 18 elementary schools with the lowest percentage of African–American students average 12.5 years, a difference of 3.33 years or 36 percent more experience.

Two problems make it difficult to address the effectiveness of the Milliken Schools:

**a. Lack of Clarity About Expected Outcomes.** PGCPS has not made clear what outcomes are expected to result from the provision of additional resources beyond stating that Milliken Schools are held to the same standards, largely measured by standardized test scores and other MSPP goals, as other schools.

**b. Program Evaluation.** PGCPS has done a recent formative evaluation for Milliken Schools similar to that done for some magnet programs. The only summative evaluation shows that in absolute terms Milliken elementary schools do less well on MSPAP reading and mathematics tests. However, when these results are controlled for socioeconomic status of students and student mobility, these schools show a pattern similar to all elementary schools.

### H. School Board Appointments to Committees

Data here are incomplete and scattered. The panel has insufficient information on which to base an analysis.

### I. Compensation

Teacher salaries are determined by a standardized salary schedule that applies equally to all. PGCPS has no provision for merit pay, so no differential treatment is possible.

The only compensation area in which differential treatment might occur is in selecting teachers for assignments that carry extra stipends (coaching, leading musical organizations, etc.) or summer pay. Data for the last

three years indicate that African–Americans and Other Race faculty get equal shares of summer compensation. Since African–Americans constituted 36–38 percent of the teaching force in those years, it appears that they are over-represented among those receiving summer compensation. The same distribution holds in both athletic coaching assignments and stipended leadership of school vocal and instrumental music groups.

### J. Curriculum

No differences among elementary schools are found in matters of curriculum, since all schools follow the same programs. Even in middle schools only slight differences exist, since students have only limited choice.

Among high schools, the only separable curricular element is the more advanced courses, particularly Advanced Placement and TAG offerings and the International Baccalaureate Program. No notable difference is to be found in terms of availability of AP and TAG courses at those schools with African–American student enrollment above and below the county average. Those above this level average 14 such courses, those below 13. For Advanced Placement courses alone, the averages are 8 and 7.5 respectively.

### K. School Location

To the degree that the panel has been able to identify issues relevant to this factor, they are addressed in the "School Facilities" section.

### L. Comparative Dropout Rates

"Dropouts" are those students who leave school in any given year for any reason other than transfer out of PGCPS. The system classifies dropouts into three categories: "voluntary," "whereabouts unknown," and "expelled or otherwise excluded." The African–American student dropout rate for all reasons approximates or is lower than that of Other Race students over the last five years and for each year. They are underrepresented in the voluntary dropout category, which accounts for 54 percent of the total. They are slightly over-represented in the "whereabouts unknown" category (33 percent of the system dropouts) and greatly over-represented among students expelled from

the system. In the school year ended June, 1996, African–Americans accounted for 91 percent of the expulsions but only 72 percent of the high school enrollment.

In 1983, 64 percent of the suspensions were meted out to African–American students at a time when they represented 49 percent of the student enrollment. That disproportionality continues, although it is not so great. Over the past five school years, African–American students have received 83–86 percent of the suspensions in each year as their percentage of system enrollment has increased from 66 percent to 72 percent. Expulsions follow the same pattern, with African–American students accounting for 84–90 percent of the expulsions in any year of the past five. The disproportionality of African–Americans is particularly high in those categories which depend heavily on judgment in determining offensive behavior.

**M. Graduation Rates**

Most students earning a diploma from a Maryland high school receive either a Maryland Diploma or a Maryland Diploma with a Certificate of Merit. The Certificate of Merit signifies the student's successful completion of a State-specified academic program more rigorous and extensive than is required to earn the diploma alone.

In the spring of 1996, 63 percent of all students graduating from PGCPS received the Maryland Diploma, 36 percent the Diploma with Certificate of Merit. Over the past five years, graduation rates for all racial/ethnic groups have been proportionate to their numbers in the student population. However, African–American students completed the more demanding program at a rate lower than their percentage representation in the population: in spring, 1996, for example, African–Americans were 72 percent of the graduating class but 63 percent of the Certificate of Merit awardees. The rate at which African–Americans earn the Certificate of Merit has, however, been increasing over the past five years faster than their percentage in the graduating class.

**N. Scores on Standardized Tests**

Prince George's County students regularly take four sets of standardized tests: the California Test of Basic Skills (CTBS), the Maryland Functional Tests (MFT), the Maryland School Performance Assessment Program tests (MSPAP) and the Scholastic Achievement Test (SAT). African–American student scores on all these tests are consistently lower than for Other Race students. African–American students in comprehensive schools perform at the same levels as those in magnet schools.

Multiple regression analyses show that race, independent of the other seven variables in the equation, usually has the strongest negative association with test scores for all standardized tests at all grade levels. Socioeconomic status, as represented by eligibility for free and reduced price meals, usually has the second largest negative effect. In several equations, however, it had the greatest effect. Being in a magnet school or a school whose teachers perceive it to have a favorable climate are usually major positive contributors to test outcomes. These correlations all have a high degree of statistical significance as expected with a large sample.

Being in a Milliken school always has a negative effect, but this correlation rises to the level of statistical significance only for the MFT.

**VI. *Conclusions***

**A. The Four Questions Considered**

1. *Has there been full and satisfactory compliance with the Court's decrees?*

Over the 25 years that the *Vaughns* case has been before it, the Court has issued decrees in the following areas:

  a. Student assignment to schools

  b. Faculty hiring

  c. Faculty assignment to schools by race

  d. Staff hiring

  e. Student transportation

  f. Magnet programs

  g. Milliken II Schools

  h. Talented and Gifted Programs

The plaintiffs also brought before the Court in 1983 the matters of student assignment to classrooms, student suspension and special

education, but no court decree requiring school system action has been issued.

### a. *Student Assignment to Schools*

PGCPS has made substantial efforts to reach the goals set by the Court, but has not fully done so. The Panel believes, though, that the system has achieved compliance to the extent practicable, given increasing African–American enrollment, the geographic distribution of students, and budgetary limitations. The Panel further notes that these guidelines were intended to be flexible and flexibly administered.

### b. *Faculty Hiring*

PGCPS has mounted a concerted and imaginative program to recruit African–American teachers. The program has resulted in a steady growth in the percentage of African–American teachers in the teaching force, even at a time when the absolute number of teachers has been increasing. In the matter of teacher hiring, we find PGCPS fully in compliance with Court decrees.

### c. *Teacher Assignment to Schools by Race*

The Panel asked many principals about their conformity to system teacher staffing guidelines. Most were unclear about what those guidelines actually are, but all were certain they are within guidelines. In fact, for the current school year, a third of the schools are outside the 50% to –12 percentage point range.

When first imposed, the intention of the teacher assignment guideline was to eliminate racially identifiable faculties, which the school system has done. The other purpose is to distribute African–American teachers fairly evenly throughout the system. In view of the fact that so many principals seemed unaware of what the goals are and how they applied to their schools, we are left with some question as to how vigorously and proactively PGCPS has pursued this purpose.

### d. *Staff Hiring*

PGCPS has had continuous success in pursuing hiring practices that move the system toward a staff that "generally reflects the population of Prince George's County." Even if that goal has not been fully reached in all job categories, the system has kept its "longstanding commitment," reiterated in the MOU, "to hire and promote qualified blacks throughout all employment levels of the public school system." We find PGCPS substantially in compliance with Court decrees.

### e. *Student Transportation*

The transportation plan has been in effect since 1973. The reopening of the *Vaughns* case stemmed from a school system move in 1980 to alter that plan without court approval. Judge Kaufman's 1983 ruling required that PGCPS return to the 1973 plan, which they have done. The Court directives also require limiting transportation time for desegregation—as opposed to magnet—purposes to 35 minutes. Current desegregation busing has only a small positive effect on racial balance, and in the case of middle schools a sometimes negative effect.

The system has also maintained a major program for busing students to magnet schools. This effort has clearly had a positive effect on desegregation without creating inequalities of busing "burden" between African–American and Other Race students. The 1985 MOU required that PGCPS submit annually a "back-up" plan for involuntary busing if the Magnet Schools Program were unsuccessful. When it became evident early in their existence that the magnets were going to have their desired effect, the school system sensibly ceased work on this plan.

### f. *Magnet Programs*

The 1985 MOU is predicated upon establishment of an extensive system of magnet programs as an alternative to involuntary busing. The Magnet School Program has clearly had its desired effect on desegregation. The racial balance of magnet programs as a whole very closely tracks the racial balance of the system as a whole. Virtually all magnet programs make at least some positive contribution to desegregation. The school system has clearly met its Court-ordered obligations with respect to the establishment and maintenance of a system of

magnet programs for purposes of desegregation.

### g. *Milliken Schools*

For schools whose racial isolation admitted of no practicable mitigation, the parties in *Vaughns* agreed in the 1985 MOU that PGCPS would provide extra resources in lieu of strategies to achieve racial balance. The promised resources have been provided, even in those years in which the school system budget has been under extreme pressure. PGCPS has fully met its obligations.

### h. *Talented and Gifted Magnets*

The 1985 MOU addresses only TAG magnets, not the TAG program broadly. The parties agreed that in school year 1986–87 and thereafter African–American and Other Race enrollment would be equal, though the language does not make clear whether that equality should be in each magnet or TAG magnets as a whole. They also agreed that the resources of the TAG programs would be made available to the entire population of the school in which the program is housed.

No individual TAG magnet has an enrollment half African–American and half Other Race. Enrollment in the TAG magnets as a whole is 57.2 percent African–American, 42.3 percent Other Race. If the intention of the agreement was to work toward fuller representation of African–Americans in TAG magnets, the goal has been more than met. If the goal was to keep African–American enrollments proportionate in all schools, as their percentages in the school system grew, to the 50 percent contemplated in 1986–87, the goal, which in 1996–97 would be 61 percent, has almost been met.

No school has become exclusively a TAG magnet school and TAG resources have been shared in various ways with other children in the schools.

We conclude that PGCPS has substantially met the requirements of Court decrees with regard to TAG magnet programs.

In summary, we have concluded that in six of these eight areas in which the Court has issued decrees, PGCPS has fully or substantially complied. In the area of student assignments to schools, we believe the system has complied to the extent practicable. Only in the area of faculty assignment to schools do we believe that a more proactive effort might be made, although we are by no means sure that, given a variety of circumstances over which the system has no control, much improvement in the actual results could be achieved.

### 2. *Is retention of judicial control necessary or practicable to achieve compliance in any respect?*

In only two of the factors considered above do we find any reason to believe that the system is not in full or substantial compliance with Court decrees. In the matter of student assignment we believe that PGCPS is in compliance to the extent practicable. With regard to teacher assignment to schools, we cannot determine how much impact Court insistence on a more proactive effort, absent a change in seniority override provisions, could hasten movement toward the goals.

### 3. *Has the School Board demonstrated a good faith commitment to the whole of the Court's decrees since they were entered?*

Judge Kaufman's 1983 decision indicated that he did not think the School Board had done all that it could to eliminate racial imbalance in the schools. Since that time, however, the Board appears generally to have done so. Certainly large amounts of money have been invested in busing, in magnet and Milliken programs and in faculty hiring. Substantial results have been achieved in hiring and in the establishment of magnet programs. Reporting requirements, except for the unnecessary back-up busing plan, have been faithfully met.

The Panel raises questions in the related matter of system record keeping, but the members do not mean to say that the absence of a more consistent, systematic, outcomes-oriented data collection, research and evaluation program constitutes bad faith.

### 4. *Have vestiges of past discrimination been eliminated to the extent possible?*

Here the panel discusses those factors not included in prior Court decrees.

Two factors, "School Board Appointments" and "School Location," have not raised any issues seen relevant to past discrimination.

Analysis of four other factors reveals no discernible patterns that would raise questions about vestiges of prior segregation. These factors include extracurricular activities, the physical condition of facilities, graduation rates, and summer and stipended employment opportunities.

Another group of factors, largely related to student performance or treatment of students, shows clear patterns of disproportionality. These factors include the underrepresentation of African–Americans in TAG programs and Advanced Placement courses, their overrepresentation in some special education programs and among those suspended and expelled, and a persistent gap between African–Americans and Other Race students on standardized tests. The panel found no evidence in policy or procedure to link these factors specifically to vestiges of prior segregation. The clear and pervasive statistical association, independent of other variables, of lower standardized test scores with being African–American requires consideration.

A further group of factors involving assignment of teachers seems to the Panel to show a pattern of differential treatment between schools with higher and lower African–American student enrollment.

- *Assignment of teachers by years of experience.*
  Average teacher years of experience in schools with African–American student enrollment above the county average has for at least six years been substantially lower than that for schools with African–American student enrollment below the average for the system. Similarly, average teacher experience for the 18 Milliken II elementary schools in the current year is 3.33 years less than the 18 elementary schools with the lowest African–American student population. Schools with higher percentages of African–American students have a larger percentage of new teachers and a smaller percentage of highly experienced teachers than schools with lower African–American enrollments. The pattern is persistent and the differences in average years of experience are substantial.

- *Assignment of Teachers by Years of Education.* The same pattern holds true for years of teacher education, but here the absolute differences are not very great, even if they are sometimes statistically significant. The Panel makes a point of this pattern because school system studies show a strong positive correlation between teacher years of experience and student performance relative to predicted outcomes on MSPAP tests.

- *Assignment of Teachers to Advanced Placement Courses.* The percentage of African–American instructors among those teaching Advanced Placement courses (15%) is strikingly low proportionally.

## B. Further Considerations

Certain complexes of related phenomena do not appear to be the result of any intentional discrimination or to constitute a pervasive pattern of discrimination but could in concert produce persistent disparities that raise concern. Examples include:

- Disproportionately low representation of African–American students in more demanding high school programs.

- Certain high schools where differential representation of African–American students and teachers is consistently observable in a variety of circumstances.

- Two particular comparisons of schools with parallel programs where the school with the higher percentage African–American enrollment has the much inferior facility.

The Panel also expresses concerns about the effectiveness of structures of accountability for dealing with a range of desegregation-related issues.

## C. A Final Recommendation

If the Prince George's County Public Schools are declared a unitary district, the system should first be required to submit a plan of action for their new status. Among such other matters as the Court and the system consider important, this document should:

- declare intentions for keeping special resources in place,
- set forth post-unitary policies consistent with these intentions,
- lay out plans for identifying the funds to continue support of programs that have been effective in achieving desegregation,
- define areas of accountability,
- provide the design for a systematic research and evaluation program to assure that the district continues in desegregated status.

## APPENDIX C

## COMMENTS OF COURT-APPOINTED PANEL

## AT FAIRNESS HEARING

## August 25, 1998

These comments are offered on behalf of the Court-appointed panel whose study of the status of desegregation in the Prince George's County Public Schools provided baseline information for the trial held nine months ago. We concluded that in nearly all respects PGCPS had complied with court directives and that little more could be done to correct those inequities that have been the object of Court order. We did note some disparities in educational outcomes between African–American and Other Race students and found some other instances of racially disproportionate representation of students or teachers. We could not, however, conclude that any of the differences we noted were or were not attributable to vestiges of prior segregation.

Thus we are pleased to see the Memorandum of Understanding among the parties that is before the Court today. We agree that much remains to be done to improve educational outcomes for African–American students and to raise the level of student performance generally. But those results are more likely to be achieved through the efforts of the schools and the community, with the support of state and county governments, not through the agency of the Court.

We are pleased to note the emphasis in the Memorandum of Understanding, notably in its fourth section, on academic indicators of student success. The appointment of an oversight panel to monitor progress and the management of those activities designed to improve progress seems well advised. We hope that the group will pay particular attention to the way administrative structures for managing the schools are made operational, a matter about which the Panel had some concern.

Continued support of the Magnet School Program, including added administrative support, is likewise given prominence in the MOU. This program has been a major engine not only of desegregation but also educational innovation and excellence.

Strengthened support for what the MOU calls "schools with racially non-diverse student populations" is important, especially to carry out educational strategies that have been proven effective. We hope that the schools, supported by the oversight panel, will clarify the criteria by which the efficacy of the additional resources and special programs will be judged. As our report indicated, we think it necessary that all involved be clear about what constitutes success.

We support the decision to phase out court-ordered busing. While one might have thought from the newspaper accounts that our Panel's report dealt exclusively with this topic, our analysis certainly did indicate that this feature of the court orders had outlived its original purposes.

The Memorandum of Understanding touches in constructive ways on several other matters of racial imbalance we mentioned, such as student discipline and the numbers of African–American teachers of Advanced Placement courses. The school system

needs to assure itself that these and other disparities are not related to racial attitudes.

Overall, we believe that the Memorandum of Understanding touches on the right issues and with the right emphases. It fairly addresses the remaining problems that our study raised. It forms a basis for moving those issues and their resolution completely into the arena in which they can best be resolved: the schools and the community that supports and relies on them.